No. 23-3740

# In The United States Court of Appeals for the Sixth Circuit

John and Jane Doe No. 1, et al.,
*Plaintiffs-Appellants*

v.

Bethel Local School District Board of Education, et al.,
*Defendants-Appellees*

Anne Roe
*Intervenor Defendant-Appellee*

On Appeal from the United States District Court for the Southern District of Ohio
No. 3:22-cv-337, Hon. Michael J. Newman

## OPENING BRIEF OF PLAINTIFFS-APPELLANTS

Nicholas Barry
America First
Legal Foundation
611 Pennsylvania Ave., SE #231
Washington, DC 200003
615.431.3903
Nicholas.barry@aflegal.org

Benjamin M. Flowers
*Counsel of Record*
Joseph P. Ashbrook
Julie E. Byrne
Ashbrook Byrne Kresge LLC
P.O. Box 8248
Cincinnati, Ohio 45249
513.201.5775
bflowers@ashbrookbk.com

*Counsel for Plaintiffs-Appellants*

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 23-3740              Case Name: Doe v. Bethel Local Sch. Dist. Bd. of Ed

Name of counsel: Benjamin M. Flowers

Pursuant to 6th Cir. R. 26.1, JOHN AND JANE DOE NO.1; CHILD NO.1A, a minor, by and through her legal guardians John and Jane Doe No. 1; JOHN AND JANE DOE NO. 2; JOHN DOE NO. 3; CHILD NO. 3B, a minor, by and through her legal guardian John Doe No. 3; CHILD NO. 3C, a minor, by and through his legal guardian John Doe No. 3; JANE DOE NO. 4; CHILD NO. 4D, a minor, by and through his legal guardian Jane Doe No. 4; JANE DOE NO. 5; CHILD NO. 5E, a minor, by and through his legal guardian Jane Doe No. 5; JANE DOE NO. 6; JANE DOE NO. 7; CHILD NO. 7F, minor, by and through his legal guardian Jane Doe No. 7; JOHN AND JANE DOE NO. 8; JOHN DOE NO. 9

makes the following disclosure:

1.  Is said party a subsidiary or affiliate of a publicly owned corporation? If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

No

2.  Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest:

No

---

CERTIFICATE OF SERVICE

I certify that on _____ February 14, 2024 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Benjamin M. Flowers

---

This statement is filed twice: when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents. See 6th Cir. R. 26.1 on page 2 of this form.

# TABLE OF CONTENTS

Rule 26.1 Statement ............................................................... i

Table of Authorities ............................................................. iii

Statement Regarding Oral Argument ...................................... ix

Jurisdictional Statement ........................................................ 1

Statement of the Issues Presented for Review ........................ 2

Introduction ......................................................................... 3

Statement ............................................................................. 5

Summary of Argument ........................................................ 12

Standards of Review ........................................................... 16

Argument ........................................................................... 19

   I.    The challenged policy violates the plaintiffs' religious freedom. .............. 19

       A.   The challenged policy violates the U.S. and Ohio constitutions. ....... 19

       B.   The District Court's contrary analysis fails. .................................... 28

  II.    The plaintiffs have Article III standing to seek a declaratory judgment. ..... 33

       A.   The parents and students alleged facts establishing Article III standing to bring a Title IX claim. .................................... 37

       B.   The District Court erred in holding that the plaintiffs lacked standing to seek a declaratory judgment. ...................................... 42

 III.   The parent plaintiffs adequately pleaded a claim that Bethel violated their fundamental right to control the upbringing of their children. .................. 45

Conclusion ......................................................................... 59

Certificate of Compliance .................................................... 60

Certificate of Service .......................................................... 61

Designation of Relevant Documents ..................................... 62

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ackerman v. Washington*,
16 F.4th 170 (6th Cir. 2021) .............................................................. 30

*Adams by and through Kasper v. School Board of St. Johns County*,
57 F.4th 791 (11th Cir. 2022) (*en banc*) .......................................*passim*

*Am. Legion v. Am. Humanist Ass'n*,
139 S. Ct. 2067 (2019) ........................................................................ 26

*Banse v. Muhme*,
7 Ohio C.D. 224 (Ohio Cir. Ct. Jan. 28, 1897) .................................. 47

*Binno v. Am. Bar Ass'n*,
826 F.3d 338 (6th Cir. 2016) ......................................................... 37, 40

*Blau v. Fort Thomas Pub. Sch. Dist.*,
401 F.3d 381 (6th Cir. 2005) ..........................................................*passim*

*Bostock v. Clayton Cnty.*,
140 S. Ct. 1731 (2020) ........................................................................ 34

*Charlton-Perkins v. Univ. of Cincinnati*,
35 F.4th 1053 (6th Cir. 2022) ....................................................... 37, 43

*Church of Lukumi Babalu Aye, Inc. v. Hialeah*,
508 U.S. 520 (1993) ................................................................19, 29, 30

*Dahl v. Bd. of Trustees of W. Michigan Univ.*,
15 F.4th 728 (6th Cir. 2021) (*per curiam*)....................................12, 19

*Dart Cherokee Basin Operating Co., LLC v. Owens*,
574 U.S. 81 (2014)............................................................................... 32

*Dodds v. Dep't of Educ.*,
845 F.3d 217 (6th Cir. 2016) (*per curiam*) ........................................ 35

*Enriquez-Perdomo v. Newman*,
  54 F.4th 855 (6th Cir. 2022) ........................................................... 17

*Ezell v. City of Chicago*,
  651 F.3d 684 (7th Cir. 2011) ............................................................58

*Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*,
  528 U.S. 167 (2000) .........................................................................38

*Fulton v. City of Philadelphia*,
  141 S. Ct. 1868 (2021) ...............................................................*passim*

*Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*,
  491 F.3d 320 (6th Cir. 2007) ........................................................... 17

*Gerber v. Herskovitz*,
  14 F.4th 500 (6th Cir. 2021) ....................................................... 39, 40

*Golf Vill. N., LLC v. City of Powell*,
  14 F.4th 611 (6th Cir. 2021) ........................................................... 18

*Grimm v. Gloucester Cnty. Sch. Bd.*,
  972 F.3d 586 (4th Cir. 2020) ........................................................... 39

*Grubbs v. Sheakley Grp., Inc.*,
  807 F.3d 785 (6th Cir. 2015) ......................................................19, 31

*Gruenke v. Seip*,
  225 F.3d 290 (3d Cir. 2000) .......................................................*passim*

*Heffernan v. City of Paterson*,
  578 U.S. 266 (2016) ........................................................................ 39

*Henry v. Chesapeake Appalachia, L.L.C.*,
  739 F.3d 909 (6th Cir. 2014) ........................................................... 18

*Herrington v. United States*,
  6 A.3d 1237 (D.C. 2010) ..................................................................58

*Howard v. City of Detroit*,
  40 F.4th 417 (6th Cir. 2022) ........................................................... 17

*Humphrey v. Lane*,
　89 Ohio St. 3d 62 (2000) ........................................................14, 26, 27

*Jackson v. Birmingham Bd. of Educ.*,
　544 U.S. 167 (2005) ........................................................... 41

*Kanuszewski v. Michigan Dep't of Health & Hum. Servs.*,
　927 F.3d 396 (6th Cir. 2019).................................... 40, 49, 50

*Kennedy v. Bremerton Sch. Dist.*,
　597 U.S. 507 (2022) ........................................................22, 25, 31

*Kollaritsch v. Michigan State Univ. Bd. of Trustees*,
　944 F.3d 613 (6th Cir. 2019).........................................15, 39

*L.W. by and through Williams v. Skrmetti*,
　83 F.4th 460 (6th Cir. 2023) ............................................50

*Lujan v. Defs. of Wildlife*,
　504 U.S. 555 (1992)........................................................ 38, 42

*Mahanoy Area Sch. Dist. v. B. L. by & through Levy*,
　141 S. Ct. 2038 (2021) ......................................................54

*McGlone v. Bell*,
　681 F.3d 718 (6th Cir. 2012) ............................................40

*Meyer v. Nebraska*,
　262 U.S. 390 (1923) ........................................................48, 55, 56

*Minneapolis Star & Trib. Co. v. Minnesota Comm'r of Revenue*,
　460 U.S. 575 (1983)........................................................ 57

*Moderwell v. Cuyahoga Cnty.*,
　997 F.3d 653 (6th Cir. 2021)........................................ 5, 18

*Monclova Christian Acad. v. Toledo-Lucas Cnty. Health Dep't*,
　984 F.3d 477 (6th Cir. 2020) ..............................................20

*Moritz v. Garnhart*,
　7 Watts 302 (Pa. 1838) ......................................................48

*Morrow v. Wood*,
    35 Wis. 59 (1874)...........................................................................48

*In re Nat'l Prescription Opiate Litig.*,
    82 F.4th 455 (6th Cir. 2023)..........................................................32

*In re Neff*,
    20 Wash. 652 (1899) .....................................................................48

*New Doe Child #1 v. Cong. of United States*,
    891 F.3d 578 (6th Cir. 2018)....................................................14, 40

*People ex rel. O'Connell v. Turner*,
    55 Ill. 280 (1870) ....................................................................47, 52

*Parsons v. United States Dep't of Just.*,
    801 F.3d 701 (6th Cir. 2015).........................................................17

*Pierce v. Society of Sisters*,
    268 U.S. 510 (1925).....................................................15, 45, 48, 49

*Prince v. Massachusetts*,
    321 U.S. 158 (1944) .......................................................................50

*Richards v. Forrest*,
    278 Mass. 547 (1932)......................................................................46

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
    592 U.S. 14 (2020) (*per curiam*).................................................10, 20

*SFFA v. Harvard*,
    600 U.S. 181 (2023) ......................................................10, 14, 37, 58

*Stanton v. Wilson*,
    3 Day 37 (Conn. 1808) ..................................................................47

*Tandon v. Newsom*,
    593 U.S. 61 (2021) (*per curiam*) ............................................12, 20, 22

*Troxel v. Granville*,
    530 U.S. 57 (2000).....................................................................*passim*

*Trump v. Hawaii*,
    138 S. Ct. 2392 (2018) ...................................................................... 37

*United States v. Virginia*,
    518 U.S. 515 (1996) .......................................................................... 34

*Veneklase v. Bridgewater Condos, L.C.*,
    670 F.3d 705 (6th Cir. 2012) ...................................................... 18, 31

*Washington v. Glucksberg*,
    521 U.S. 702 (1997) .......................................................... 3, 46, 48, 56

*Wisconsin v. Yoder*,
    406 U.S. 205 (1972) ................................................................ *passim*

**Constituttional Provisions and Statutes**

20 U.S.C. §1681 ................................................................................. 33

20 U.S.C. §1681(a) ............................................................................ 36

20 U.S.C. §1686 ................................................................................. 24

28 U.S.C. §1291 ................................................................................... 1

28 U.S.C. §1331 ................................................................................... 1

28 U.S.C. §1343 ................................................................................... 1

28 U.S.C. § 1367 ........................................................................ *passim*

Ohio Const., art. I, §7 ................................................................ *passim*

Ohio Const., art. VI, §2 ................................................................... 51

Ohio Rev. Code §3321.04 ................................................................ 51

U.S. Const., am. I ....................................................................... 3, 39

U.S. Const., am. V ............................................................................ 46

U.S. Const, am. XIV ........................................................................ 46

U.S. Const., art. III, §2 ........................................ 37

**Rules and Regulations**

34 C.F.R. §106.33 ........................................... 24, 35

Fed. R. Civ. P. 12(b)(1) .................................... 16, 17, 42

Fed. R. Civ. P. 12(c) .......................................*passim*

**Other Authorities**

Blackstone, I *Commentaries on the Laws of England* (1765) ................. 47, 48

Comment, *Implementing Title IX: The New Regulations*, 124 U. Pa. L. Rev. 806 (1976) ................................. 34

*In re: Special Grand Jury Proceedings*, Case No. CL-22-3129 (Va. Cir. Ct. Loudon Cnty. 2022), https://perma.cc/KQ9F-RP9Q; ............ 53

John Witte, Jr., *The Nature of Family, the Family of Nature: The Surprising Liberal Defense of the Traditional Family in the Enlightenment*, 64 Emory L.J. 591 (2015) ....................... 47

Kent, II *Commentaries on American Law* (1827) ................... 47

Op. of Ohio Att'y Gen., No. 2023-0006 (May 26, 2023), https://perma.cc/E7TT-WSP5 .............................. 34, 53

Philip Hamburger, *Purchasing Submission: Conditions, Powers, and Freedom* (2021) .......................................... 42

W. Burlette Carter, *Sexism in the "Bathroom Debates": How Bathrooms Really Became Separated by Sex*, 37 Yale L. & Pol'y Rev. 227 (2019) ............. 34

## STATEMENT REGARDING ORAL ARGUMENT

Because this case presents important issues of statutory and constitutional law, the plaintiffs request oral argument.

# JURISDICTIONAL STATEMENT

The District Court had jurisdiction over this case presenting federal and state-law claims, including claims seeking relief for violations of the plaintiffs' federal constitutional rights, under 28 U.S.C. §§1331, 1343, and 1367. It entered final judgment on August 7, 2023. *See* Order, R.94, PageID#1998. The appellants timely appealed on September 5, 2023. *See* Notice of Appeal, R.95, PageID#2050. This Court has statutory jurisdiction under 28 U.S.C. §1291. The District Court dismissed one of the claims here at issue for lack of Article III standing but erred for reasons addressed below.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

**1.** Do the Free Exercise Clause, and Article I, §7 of the Ohio Constitution, allow the government to alleviate hardships arising from secular beliefs about gender by requiring religious individuals to bear those hardships instead?

**2.** Do plaintiffs have Article III standing to seek a declaratory judgment that an injurious school-district policy violates Title IX where a favorable ruling would cause the defendants to abandon the policy?

**3.** Does a school district violate the fundamental right to control the upbringing of one's child when it adopts a policy that exposes children to physical and emotional dangers, contravenes parental views on morality, and then refuses to provide parents with the information they need to make an informed decision about the proper response to the policy's imposition?

## INTRODUCTION

Title IX protects students from sex discrimination.  The Free Exercise Clause forbids religious discrimination, as does §7 of the Ohio Bill of Rights.  The Due Process Clause protects the "fundamental right[] … to direct the education and upbringing of one's children." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997).  This case implicates each provision.

Until recently, the Bethel Local School District segregated communal restrooms by sex.  This ensured that neither sex would face the risks of embarrassment, harassment, and assault presented when the sexes share restrooms.   But a transgender middle-school student, "Anne Roe," objected.  Roe wanted to use the restroom assigned to students of the opposite sex.  Bethel offered an accommodation, allowing Roe to use the school's single-occupancy restroom.  But Roe found that inconvenient (the restrooms were allegedly often occupied and distantly located) and embarrassing.  After Roe's mother hinted at filing a Title IX complaint, the school board consulted with an attorney.  That attorney advised the board—incorrectly, *see Adams by and through Kasper v. School Board of St. Johns County*, 57 F.4th 791, 811–15 (11th Cir. 2022) (*en banc*)—that Title IX entitles transgender students to use bathrooms assigned to students of the opposite sex.  Based on this bad advice, and for no

other reason, the school board adopted a new policy allowing students to use whatever communal restrooms accord with their perceived gender.

The policy change addressed Roe's concerns. But it forced other students to suffer the same hardships that drove Roe's objections. The school district is home to Muslims and Christians who object on religious grounds to sharing restrooms with the opposite sex. Even some not-particularly-religious students felt uncomfortable with the new policy. To avoid violating their religious beliefs and senses of privacy, these students had to either refrain from using the restroom (impeding their education) or else use the single-occupancy restrooms (which were even less convenient for them than for Roe, given their larger numbers, and which exposed them to ridicule for being "transphobic" or overly sensitive). In other words, they needed to bear, under the new policy, the same hardships that Roe claimed to suffer under the former policy. Parents—including some of the plaintiffs—donated supplies to support the construction of an additional single-occupancy restroom in a more convenient location. The school took their donations and built the restroom. But it refused to change its policy. Parents—including some of the plaintiffs—asked for more information. Did the policy apply to adults? How would the policy apply on overnight trips? How would the school keep students from abusing the policy? The school refused to answer.

4

All this gives rise to a host of questions.  Do the Free Exercise Clause and Article I, §7 of the Ohio Constitution allow schools to treat hardships arising from religious convictions less favorably than equivalent hardships arising from secular beliefs about gender?  Does Title IX entitle males to use girls' restrooms?  And may schools, notwithstanding the fundamental right to direct the education and upbringing of one's child, refuse to provide parents with information about school policies that contradict the "moral standards" and "religious beliefs" parents hope to "inculcat[e]"?  *Wisconsin v. Yoder*, 406 U.S. 205, 233 (1972).

The answer to each question is "no."  But the District Court either incorrectly answered these questions or incorrectly declined to assert jurisdiction.  This Court should reverse.

## STATEMENT

Because this case was dismissed at the pleading stage, the Court must accept the truth of all well-pleaded allegations.  *Moderwell v. Cuyahoga Cnty.,* 997 F.3d 653, 659 (6th Cir. 2021).  This section proceeds accordingly, sometimes referring to additional record materials too.

**1.** Bethel Local School District sits within Miami County, Ohio.  Bethel had, for years, required students to use restrooms corresponding with their biological sexes.  That recently changed, when Bethel's school board adopted a policy allowing

students to use whatever restrooms best aligned with their "gender identities." Compl., R.1, PageID#8.

Bethel—this brief's collective term for the defendants, which include the school district's board of education plus the board's members and the superintendent in their official capacities—made this change based on bad legal advice. The trouble began when a transgender student, "Anne Roe," transferred to Bethel Middle School. The school attempted to accommodate Roe by permitting Roe to use a single-occupancy restroom in the nurse's office. Roe could also use a second single-occupancy restroom reserved for faculty and located between the middle and high schools. Roe objected; the restrooms were "frequently occupied," located far from the other restrooms, and using them made Roe feel "ostracized, humiliated, and targeted by other students." Order, R.94, PageID#2000. This caused Roe to refrain from urinating during the day, which "began negatively affecting" Roe's "school performance." *Id.* (quotation omitted). Eventually, Roe's mother raised the possibility of filing a Title IX complaint against the school. *See id.* An attorney advised the school board that Title IX *forbade* requiring transgender students to use restrooms corresponding to their biological sexes. *See* Order, R.94 PageID#2003–04; Compl. R.1, PageID#3.

Bethel responded by changing its policy to let transgender students use the restrooms designated for students of the opposite sex. Compl. R.1, PageID#3. The school-board president explained at a school-board meeting that it adopted the policy "based upon the advice of our attorney that should there be a court case come before us, pending or otherwise, we would not be successful in any battle and would simply cost the district a lot of money …." Order, R.94 PageID#2004 (quotation omitted); *accord* Transcript, 17-2, PageID#593–94; Bethel Answer, R.39, PageID#842.

**2.** This change in policy did not alleviate the hardships. Instead, it transferred them to different students. Just as Roe felt uncomfortable using communal restrooms with students of the same sex, other students felt uncomfortable sharing communal restrooms with students of the opposite sex. Some of these other students are devout Muslims, who sincerely believe the sexes are distinct and that Allah demands "modesty and separateness between the sexes." Compl., R.1, PageID#11–12. Others are devout Christians who believe that "God's fashioning of a human being as a man or woman at birth is a fundamental part" of human dignity and that the intermingling of the sexes in private areas like restrooms impairs that dignity. *Id.*, PageID#14. Still others are not especially religious, they are simply uncomfortable sharing intimate spaces with students of the opposite sex.

7

Just as Roe claimed to experience anxiety and shame under the original policy, causing Roe to avoid using the restroom and thus to suffer academically, Order, R.94, PageID#2000, religious and otherwise-burdened students experienced "anxiety and emotional distress" sharing communal restrooms with students of the opposite sex, causing them to "hold their urine and avoid using the restroom at school if at all possible." Compl., R.1, PageID#12. And the single-occupancy restrooms would not have been more convenient for the latter group of students than they were for Roe—indeed, their larger numbers would have made the single-occupancy restrooms *less* convenient.

Concerned parents tried to help Bethel find solutions to accommodate everyone. Some parents—two of whom are plaintiffs—donated supplies to support the construction of a single-occupancy restroom next to pre-existing communal restrooms. This would help alleviate concerns about the accessibility and convenience of the single-occupancy restrooms. The school district took the parents' donations and built the restroom. But it did not change the policy. Nor did it tell the parents that it would waste their donations. *Id.*, PageID#10.

Parents also demanded information about the policy's operation. *Id.*, PageID#16–17. For example, they asked questions concerning the application of Bethel's transgender-accommodating policy to adults. *Id.*, PageID#17. The parents

further sought information regarding Bethel's plan for assuring safety in the restrooms, its plan for informing teachers who is allowed to use which restroom, and its approach to the boarding of students on overnight trips.  *Id.*  Bethel never answered these questions.

**3.**  When the parents' efforts proved futile, the plaintiffs in this case—devout Muslim and Christian students and parents who object on religious grounds to the challenged policy, plus one not-very-religious father who objects on non-religious grounds—sued.  The plaintiffs sought a declaratory judgment establishing that Title IX does not entitle transgender students to use restrooms designated for students of the opposite sex.  That would redress the plaintiffs' injuries by eliminating the sole basis for the new policy; it would prove that the advice on which Bethel relied was wrong.  Moreover, the plaintiffs contended that the new policy actually *violated* Title IX.  *See, e.g.*, Resp. in Opp. to Mot. to Dismiss, R.81, PageID#1687–91.  A declaratory judgment saying so would compel Bethel to abandon its policy.

The plaintiffs challenged the policy on other grounds, too.  Two such grounds matter to this appeal.  *First*, the Muslim and Christian plaintiffs alleged that the policy violated the Free Exercise Clause and Article I, §7 of the Ohio Constitution.  The plaintiffs alleged that Bethel, by accommodating Roe at the expense of religious students, unconstitutionally violated "'the minimum requirement of neutrality' to

9

religion." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 16 (2020) (*per curiam*) (quoting *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 533 (1993)).  *Second*, the parent plaintiffs alleged that Bethel violated their due-process right to control the upbringing of their children by adopting the policy and refusing to answer questions about its implementation.

**4.** Bethel and an intervenor (Roe) moved to dismiss the case.  With respect to each claim, they argued either that the plaintiffs either lacked standing to sue or failed to allege facts supporting plausible claims for relief.  They sought dismissal under Rules 12(b)(1) and (c) of the Federal Rules of Civil Procedure.

The District Court dismissed the case.

It first concluded that the plaintiffs lacked standing to bring the Title IX claim. Standing requires at least one plaintiff who "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *SFFA v. Harvard*, 600 U.S. 181, 199 (2023) (quotation omitted).  The court determined that the plaintiffs had not alleged an injury in fact because they had not alleged a violation of their own Title IX rights. *See* Order, R.94, PageID#2014–15.  The court further determined that the plaintiffs failed to establish redressability because Bethel could hypothetically continue with its policy *even if* it were convinced that Title IX did not mandate the challenged

10

policy. *See id.*, PageID#2015–16. In making these determinations, the court declined to consider the plaintiffs' argument that the challenged policy *did* violate the plaintiffs' Title IX rights. *See* Resp. in Opp. to Mot. to Dismiss, R.81, PageID#1687–91; *see also* Order, R.94, PageID#2018 n.5.

Next, the District Court dismissed the free-exercise claim under Rule 12(c). It did so based on its determination that the pleadings did not indicate Bethel's policy treated religion or religious students less favorably. *See* Order, R.94, PageID#2033–39. The court similarly dismissed the due-process claim. It acknowledged that the Fourteenth Amendment protects "a fundamental right to decide *whether* to send [a] child to a public school." *Id.*, PageID#2025 (emphasis in original, quotation omitted)). But it determined that the right neither entitles parents to information about, nor empowers them to challenge, "a state school's choices about curriculum and school operations." *Id.*

Finally, having dismissed the plaintiffs' federal-law claims, the court declined to exercise supplemental jurisdiction over the plaintiffs' state-law claims, including their claim under Article I, §7 of the Ohio Constitution. *Id.*, PageID#2046–48.

**5.** The plaintiffs timely appealed. *See* Notice of Appeal, R.95.

Two bits of housekeeping. First, Roe has moved to withdraw as a party. *See* Unopposed Motion to Withdraw, Doc.15 (Sept. 25, 2023). Second, the plaintiffs

declined to appeal the District Court's decision not to accept jurisdiction over certain state-law claims, including their claim alleging that Bethel violated Ohio's Open Meetings Act. Compl., R.1, PageID#18. Because the District Court declined to assert jurisdiction over the Open Meetings Act claim, Order, R.94, PageID#2045–48, the plaintiffs may raise that claim in the future.

## SUMMARY OF ARGUMENT

**I.** "The First Amendment" prevents the government "from 'prohibiting the free exercise' of religion." *Dahl v. Bd. of Trustees of W. Michigan Univ.*, 15 F.4th 728, 731 (6th Cir. 2021) (*per curiam*). Government policies trigger the Free Exercise Clause, and are subject to strict scrutiny, if they treat "comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (*per curiam*). Policies are thus subject to strict scrutiny when they accommodate secular preferences at the expense of religious preferences even though both "undermine[] the government's asserted interests in a similar way." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1877 (2021).

Bethel's policy is subject to strict scrutiny because it treats "comparable secular activity more favorably than religious exercise." *Tandon*, 593 U.S. at 62. Devout Christians and Muslims in Bethel sincerely believe that sharing communal restrooms with the opposite sex is an affront to God. Comp., R.1, PageID#11–15. On the other

hand, transgender students may believe that sharing communal restrooms with the same sex contradicts their secular beliefs about gender. The students in one of these groups must either use a restroom that contradicts their deeply held beliefs, refrain from using the restroom altogether, or else use Bethel's small number of private restrooms, for which "access is limited." *Id.*, PageID#11. Bethel sided with the transgender students; it adopted a policy that alleviates the burdens arising out of their *secular* beliefs by requiring religious students to experience the same (or greater) hardships because of their *religious* beliefs. The policy thus accommodates secular preferences at the expense of religious preferences, even though both "undermine[] … in a similar way" Bethel's interest in ensuring that all students are comfortable with the restrooms available to them. *Fulton*, 141 S. Ct. at 1876; *see also* Compl., R.1, PageID#21–22. That unequal treatment triggers strict scrutiny.

Bethel cannot satisfy strict scrutiny, especially at the pleading stage. "A government policy can survive strict scrutiny only if it advances interests of the highest order and is narrowly tailored to achieve those interests." *Id.* at 1881 (quotation omitted). The challenged policy is not narrowly tailored to any such interest and neither Bethel nor Roe has shown otherwise at the pleading stage.

In sum, the plaintiffs plausibly alleged a free-exercise violation. Those same allegations support a claim under Article I, §7 of the Ohio Constitution, which

provides heightened protection for religious liberty. *Humphrey v. Lane*, 89 Ohio St. 3d 62, 67 (2000). The District Court did not consider this claim; it declined supplemental jurisdiction under 28 U.S.C. §1367(c)(3), which permits courts to refuse jurisdiction over state-law claims after "dismiss[ing] all claims over which" they have "original jurisdiction." Because the District Court erred when it dismissed the federal free-exercise claim, it also erred in dismissing the state-law claim.

**II.** Schools that accept federal funding agree to be bound by Title IX. Bethel adopted the challenged policy because a lawyer advised Bethel that this was what Title IX required. The lawyer erred, *Adams*, 57 F.4th at 804, and the plaintiffs sued for a declaratory judgment saying so. The District Court held that they failed to allege facts sufficient to support their standing to sue. It erred. Plaintiffs have standing when they "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *SFFA*, 600 U.S. at 199 (quotation omitted). The plaintiffs here alleged facts sufficient to support each element.

*Injury in fact.* The plaintiffs sustained two injuries in fact. First, they alleged that the challenged policy violates their constitutional rights, which necessarily constitutes an injury in fact. *New Doe Child #1 v. Cong. of United States*, 891 F.3d 578, 586 (6th Cir. 2018). Additionally, the student plaintiffs alleged that the challenged

policy deters them from using the restroom when they otherwise would, to their educational detriment.  Interference with "access to the educational opportunities or benefits provided by the school" satisfies the injury-in-fact element.  *Kollaritsch v. Michigan State Univ. Bd. of Trustees*, 944 F.3d 613, 622 (6th Cir. 2019) (quoting *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999)).

*Traceability.*  All injuries are the direct result of, and thus fairly traceable to, the challenged policy.

*Redressability.*  The plaintiffs' injuries would be redressed by a favorable ruling.  As a factual matter, Bethel would abandon its policy were the plaintiffs to secure a declaratory judgment.  Regardless, a declaratory judgment will require Bethel to abandon its policy.  The plaintiffs can prevail in two ways.  First, they could show that the policy *violates* Title IX.  A ruling along those lines would force Bethel to abandon the policy to comply with Title IX.  Alternatively, the plaintiffs could show that Title IX *does not require* the policy.  A decision saying so would also force Bethel to change course, since state law—namely, article I, §7 of the Ohio Constitution—forbids the policy.  Thus, no matter how the plaintiffs prevail, the judgment will redress their injuries.

**III.**  The Due Process Clause guarantees parents a substantive right "to direct the upbringing and education of children under their control."  *Pierce v. Society of*

*Sisters*, 268 U.S. 510, 534–35 (1925).  This "right plainly extends to the public school setting." *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 395 (6th Cir. 2005).  And public schools violate this right when they "obstruct the parental right to choose the proper method of resolution" to matters of great importance to a child's upbringing, *Gruenke v. Seip*, 225 F.3d 290, 306 (3d Cir. 2000), such as policies that require a child to act contrary to the "moral standards" and "religious beliefs" that his parents hope to "inculcat[e]," *Yoder*, 406 U.S. at 233.

Bethel violated the parents' rights.  The challenged policy requires children to share communal restrooms with the opposite sex, and thus encourages them to act contrary to the "moral standards" and "religious beliefs" that these parents hope to "inculcat[e]." *Id.*  Further, by allowing both sexes to simultaneously access communal restrooms, the school exposes students to the risk of harassment and assault.  Finally, Bethel refused to provide the parents with the information needed to assess the threat the policy poses to their children's safety and moral upbringing. Bethel thus unconstitutionally "obstruct[ed] the parental right to choose the proper method" of responding to the challenged policy. *Gruenke*, 225 F.3d at 306.

## STANDARDS OF REVIEW

*Rule 12(b)(1).*  The District Court dismissed the plaintiffs' Title IX claims for lack of standing under Rule 12(b)(1) of the Federal Rules of Civil Procedure.  "Rule

12(b)(1) motions to dismiss for lack of subject-matter jurisdiction generally come in two varieties: a facial attack or a factual attack." *Howard v. City of Detroit*, 40 F.4th 417, 422 (6th Cir. 2022) (quotation omitted). A facial attack challenges the sufficiency of the pleadings. Thus, when adjudicating such an attack, "both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Parsons v. United States Dep't of Just.*, 801 F.3d 701, 710 (6th Cir. 2015) (quotation omitted). But a movant may also make a "factual attack" under Rule 12(b)(1). This occurs when a party introduces evidence to raise "a factual controversy" regarding standing, at which point "the district court must weigh the conflicting evidence to arrive at the factual predicate that subject-matter [jurisdiction] does or does not exist." *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007). This Court reviews facial dismissals *de novo*. *Howard*, 40 F.4th at 422. "When considering a factual attack," this Court reviews "factual findings" for clear error and reviews *de novo* the district court's application of law to fact. *Enriquez-Perdomo v. Newman*, 54 F.4th 855, 861–62 (6th Cir. 2022).

**Rule 12(c).** The District Court rejected the plaintiffs' free-exercise and due-process claims under Rule 12(c) of the Federal Rules of Civil Procedure. This Court reviews "*de novo* a judgment on the pleadings granted pursuant to Rule 12(c)."

17

*Moderwell,* 997 F.3d at 659 (emphasis in original, quotation omitted). "For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment" as a matter of law. *Id.* (quotation omitted). And while the inquiry "rests primarily upon the allegations of the complaint, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint also may be taken into account." *Henry v. Chesapeake Appalachia, L.L.C.*, 739 F.3d 909, 912 (6th Cir. 2014) (quotation omitted).

***Supplemental jurisdiction.*** After dismissing the plaintiffs' federal claims, the District Court declined jurisdiction over the state-law claims. "A district court's decision to decline supplemental jurisdiction over state law claims under 28 U.S.C. § 1367 is reviewed for abuse of discretion." *Golf Vill. N., LLC v. City of Powell*, 14 F.4th 611, 624 (6th Cir. 2021). District courts never abuse their discretion by "declining to exercise supplemental jurisdiction over an action with no remaining federal claims." *Id.* (quotation omitted). But if they err in dismissing a plaintiff's federal claims, this Court must reverse the refusal to exercise supplemental jurisdiction. *See Veneklase v. Bridgewater Condos, L.C.*, 670 F.3d 705, 716 (6th Cir. 2012). If there are other potential grounds for declining jurisdiction, this Court may remand for the

18

district court to "re-examine whether to exercise its discretion to hear any of the re-maining state law claims." *Grubbs v. Sheakley Grp., Inc.*, 807 F.3d 785, 806 (6th Cir. 2015).

## ARGUMENT

### I.   The challenged policy violates the plaintiffs' religious freedom.

The plaintiffs plausibly alleged that the challenged policy violates the Free Ex-ercise Clause and Article I, §7 of the Ohio Constitution.

#### A.   The challenged policy violates the U.S. and Ohio constitutions.

##### 1.   Free Exercise Clause.

*a.* "The First Amendment, as incorporated through the Fourteenth Amend-ment, prevents a state from 'prohibiting the free exercise' of religion." *Dahl*, 15 F.4th at 731 (quoting U.S. Const., am. I).  Ordinarily, "neutral and generally applicable" rules that "incidentally burden" religious practice will not violate the Free Exercise Clause. *Fulton*, 141 S. Ct. at 1876.  But the government "fails to act neutrally when it proceeds in a manner intolerant of religious beliefs." *Id.* at 1877.  And government policies are not "generally applicable" if they "prohibit[] religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Id.*  This means the government infringes free-exercise rights if it "de-cides that the governmental interests it seeks to advance are worthy of being pursued only against conduct with a religious motivation." *Church of Lukumi Babalu Aye, Inc.*

*v. City of Hialeah.*, 508 U.S. 520, 542–43 (1993). For example, States violated the Free Exercise Clause during the pandemic when they shuttered religious institutions while allowing secular facilities presenting similar risks to remain open. *See Roman Cath. Diocese of Brooklyn*, 592 U.S. at 17–18; *Monclova Christian Acad. v. Toledo-Lucas Cnty. Health Dep't*, 984 F.3d 477, 481 (6th Cir. 2020).

Put succinctly, "government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise." *Tandon*, 593 U.S. at 62. A "government policy can survive strict scrutiny only if it advances interests of the highest order and is narrowly tailored to achieve those interests." *Fulton*, 141 S. Ct. at 1881 (quotation omitted).

*b.* The facts alleged show that Bethel violated the Free Exercise Clause by adopting the challenged policy.

This dispute implicates diametrically opposed concerns arising from two different populations. On the one hand, transgender students would like to use the communal restrooms set aside for students of the opposite sex; if not allowed to do so, they must either use restrooms at odds with their beliefs, refrain from using the restroom, or else use only single-occupancy restrooms, for which "access is limited" in the Bethel schools. Compl., R.1, PageID#11. Anne Roe was one such student. Roe

desired access to the restrooms designated for students of the opposite sex; Roe, a male, felt uncomfortable using communal restrooms with boys. *See* Decl. of Anne Roe, R.13-1, PageID#127. Further, Roe found the single-occupancy restrooms embarrassing. *Id.*, PageID#125. Roe found them inconvenient, too, because of their location and the fact that they were (allegedly) often occupied. *Id.*, PageID#123–24. This matrix of desires caused Roe to refrain from using the restroom, hindering Roe's education. *Id.*, PageID#125–26.

On the other hand, devout Christian and Muslims desire not to share—and not to have their children share—communal restrooms with students of the opposite sex. A policy allowing both sexes access to communal restrooms would force these students to either use restrooms at odds with their beliefs, refrain from using the restroom, or use only single-occupancy restrooms. Compl., R.1, PageID#11–12, 14–15. Those single-occupancy restrooms would be no more convenient for them than for transgender students; indeed, these restrooms would be less convenient because, given Bethel's large religious population, *id.*, PageID#11, more students would be vying for access to the same lavatories.

Bethel sided with the transgender students, allowing them to use restrooms designated for the opposite sex. In so doing, it treated equivalent hardships differently; its policy treats hardships arising from secular beliefs about gender more

21

favorably than identical hardships arising from religious beliefs. *Id.*, PageID#16. And that unequal treatment burdens the plaintiffs' free exercise of religion: the challenged policy forces students to compromise their religious beliefs if they wish to have equal access to restrooms, and it undermines the parents' religious commitment to keeping their kids from sharing intimate spaces with the opposite sex. *Id.*, PageID#11–16.

Bethel's policy is neither neutral nor generally applicable. Bethel "proceed[ed] in a manner intolerant of religious beliefs" by treating hardships arising from those beliefs as less significant than identical hardships arising from secular beliefs, meaning the policy is not neutral. *See Fulton*, 141 S. Ct. at 1877 (quotation omitted). It is not generally applicable, either. "A government policy will fail the general applicability requirement if it 'prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way.'" *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 526 (2022) (quoting *Fulton*, 141 S. Ct. at 1877). Stated differently, a rule is not generally applicable when it accords preferential treatment to secular conduct. *Tandon*, 593 U.S. at 62. That is what the challenged policy does: it treats student choices about the sex of the individuals with whom they share restrooms more favorably when those choices rest on secular beliefs

about gender rather than religious beliefs. This unequal treatment of religion defeats any argument that the policy is generally applicable.

Indeed, the new policy exhibits flaws analogous to those in the policy that *Fulton* held unconstitutional. There, Philadelphia's contracts with foster-care-placement agencies forbade those agencies from "reject[ing] a child or family … based upon … their … sexual orientation … unless an exception is granted by the Commissioner or the Commissioner's designee, in his/her sole discretion." *Fulton*, 141 S. Ct. at 1878 (quotation omitted). Catholic Social Services—a foster-care agency that "would not certify same-sex couples to be foster parents due to its religious beliefs about marriage," *id.* at 1874—protested. It argued that this provision unconstitutionally forced it to choose between participating in the system or compromising its religious convictions. *Id.* at 1876. The Court agreed. *Id.* Of most relevance here, it determined that the clause was not generally applicable, since it allowed for exceptions. That meant Philadelphia could treat hardships arising from religious convictions less favorably than other hardships, destroying the provision's general applicability. *Id.* at 1878. Put differently, the policy created a system that allowed Philadelphia to accommodate secular preferences but not religious preferences.

If anything, Bethel's policy is even worse. Rather than creating *opportunities* for less-favorable treatment of equivalent hardships, the challenged policy *in fact*

treats hardships stemming from religious convictions less favorably than hardships stemming from secular beliefs.

Because the policy is "not neutral and generally applicable," it "trigger[s] strict scrutiny." Bethel bears the burden of satisfying that standard and cannot do so. *Fulton*, 141 S. Ct. at 1881 (quotation omitted). The policy does not further "interests of the highest order." *Fulton*, 141 S. Ct. at 1881 (quotation omitted). The school adopted the policy because it believed Title IX required it to. But Title IX requires no such thing. *Adams*, 57 F.4th at 804. Indeed, Title IX expressly permits sex-segregated "living facilities," 20 U.S.C. §1686, which has long been understood to permit sex-segregated restrooms, 34 C.F.R. §106.33. In any event, compliance with a federal statute cannot, standing alone, constitute an interest of the highest order. After all, federal statutes are *themselves* unconstitutional as applied to circumstances in which they restrict the free exercise of religion unless they are narrowly tailored to advancing interests of the highest order.

With Title IX out of the picture, any chance at satisfying strict scrutiny collapses. The policy cannot be justified as narrowly tailored to protecting student safety; schools across the country maintain safe environments without burdening religion or allowing the sexes to share restrooms. Nor can the policy be justified as narrowly tailored to ensuring that all students have access to restrooms they are

comfortable using.  Even assuming that could constitute a government interest of the highest order, Bethel could accommodate that interest without burdening religion by allowing the limited number of transgender students to use single-occupancy restrooms.  If the original single-occupancy restrooms were inconveniently located, the parents who supported installation of a new single-occupancy restroom next to the communal restrooms solved that problem.  And if the single-occupancy restrooms were too often occupied, the school could limit their use to students with pre-approved reasons, freeing up availability.  Alternatively, Bethel could accommodate *both* religious and transgender students by offering sex-segregated communal restrooms *along with* communal restrooms open to all.  Or it could offer exclusively single-occupancy restrooms in greater numbers.  (This latter option would also be a more narrowly tailored means for "eliminat[ing] discrimination on the basis of sex."  Order, R.94, PageID#2039.  Regardless, neither Bethel nor Roe has shown that sex-segregated bathrooms constitute discrimination of the sort the government has an "interest of the highest order" in stopping.  *Fulton*, 141 S. Ct. at 1881 (quotation omitted)).  The policy's defenders bore the burden of proving the impossibility of these alternatives.  *Kennedy*, 597 U.S. at 524.  Neither Bethel nor Roe carried that burden at the pleading stage.

25

Because the plaintiffs plausibly alleged a violation of their federal free-exercise rights, the District Court erred when it dismissed their claim under Rule 12(c).

### 2.    Article I, § 7 of the Ohio Constitution.

*a.* The United States Constitution "sets a floor for the protection of individual rights," but States may provide greater protections. *Am. Legion v. Am. Humanist Ass'n*, 139 S. Ct. 2067, 2094 (2019) (Kavanaugh, J., concurring) (citing Jeffrey S. Sutton, *51 Imperfect Solutions* (2018)). When Ohioans ratified their constitution, they chose to provide greater protections for religious liberty. Article I, §7 of the Ohio Constitution says, in relevant part:

> All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own conscience. No person shall be compelled to attend, erect, or support any place of worship, or maintain any form of worship, against his consent; and no preference shall be given, by law, to any religious society; nor shall any interference with the rights of conscience be permitted....

Note the breadth of this right. Whereas the First Amendment protects the right to freely exercise *religion*, the Ohio Constitution protects "rights of *conscience*." *Id.* (emphasis added). And whereas the First Amendment forbids laws *prohibiting* the free exercise of religion, the "Ohio Constitution allows no law that even *interferes* with the rights of conscience." *Humphrey v. Lane*, 89 Ohio St. 3d 62, 67 (2000) (emphasis in original). Thus, even laws with "tangential effects" on religion are "potentially unconstitutional" under Ohio's Constitution. *Id.* So, whereas neutral laws of

26

general applicability escape scrutiny under the Free Exercise Clause, "a generally applicable, religion-neutral state regulation that … violates a person's right to free exercise of religion" under the Ohio Constitution will be upheld only if it "serves a compelling state interest and is the least restrictive means of furthering that interest." *Id*. at 66.  In a challenge to such a regulation, the plaintiff bears the initial burden of showing that the regulation burdens a sincerely held religious belief.  *Id*. at 68–69.  If the challenger makes that showing, "the burden shifts to the" government" to identify a compelling state interest and to prove narrow tailoring.  *Id*. at 69.

*b.*  Bethel infringed the state constitution when it adopted the challenged policy.  Bethel's preferential treatment of secular beliefs interferes with the plaintiffs' rights of conscience for all the same reasons it interferes with their free exercise of religion.  *See above* 20–26.  In any event, the plaintiffs alleged a sincere religious objection to using (or having their children use) the same restrooms as students of the opposite sex.  *See* Order, R.94, PageID#2031, n.7.  Thus, strict scrutiny applies regardless of whether the policy is neutral and generally applicable.  *Humphrey*, 89 Ohio St. 3d at 66.  Bethel cannot satisfy that standard, as discussed above.

**B.   The District Court's contrary analysis fails.**

The District Court dismissed the plaintiffs' free-exercise claim under Rule 12(c), and it declined to exercise supplemental jurisdiction over the plaintiffs' state-law claim.  It erred.

**1.**  The District Court determined that the plaintiffs failed to allege a violation of the Free Exercise Clause.  It based this determination on its conclusion that the policy is "neutral and generally applicable."  Order, R.94, PageID#2033.  The court observed that the challenged policy allows all students "to use the bathroom that corresponds with their gender identity."  *Id.*  The court deemed this policy "facially neutral because it makes no reference, overt or implied, to religion or religious conduct."  *Id.*  The court further reasoned that the policy is "generally applicable because it restricts religious and nonreligious conduct equally—every student gets to use the bathroom that corresponds with their gender identity."  *Id.*  Because neutral and generally applicable policies are subject to rational-basis review, and because the District Court found that the policy satisfied that easy-to-meet standard, the court dismissed the plaintiffs' free-exercise claim under Rule 12(c).  *Id.*, PageID#2038.

The District Court's analysis misses the policy's fundamental flaw:  the policy treats religious beliefs less favorably than secular beliefs.  The policy alleviates the harms suffered by secular students who cannot use the communal restrooms that

correspond to their felt sense of gender by forcing *identical* harms on religious students who cannot share communal restrooms with the opposite sex because of their religious convictions. As explained above, that means the policy is not neutral and generally applicable.

Moreover, the District Court's reasoning contradicts binding precedent. For example, the court deemed the policy neutral "because it makes no reference … to religion or religious conduct." *Id.*, PageID#2033. And it deemed Bethel's policy generally applicable because "it restricts religious and nonreligious conduct equally." *Id.* But the same could have been said about the challenged provision in *Fulton*. That provision made "no reference … to religion," *id*, and it "restrict[ed] religious and nonreligious conduct equally," since it forbade *any* placement agency from refusing to place a child with a same-sex family before obtaining an exemption from Philadelphia. *Id.*; *see Fulton*, 141 S. Ct. at 1878. As the Supreme Court held long ago, "facial neutrality" does not establish the absence of a free-exercise violation; the Free Exercise Clause "protects against government hostility which is masked, as well as overt." *Lukumi*, 508 U.S. at 534. Thus, the challenged policy's superficially neutral features do not spare it from strict scrutiny under the Free Exercise Clause.

The District Court supported its contrary conclusion by citing *Parents for Privacy v. Barr*, 949 F.3d 1210, 1235 (9th Cir. 2020). Order, R.94, PageID#2036–37. But

29

that pre-*Fulton* case contains precisely the same analytical flaws as the District Court's decision. It mistakenly deems neutral and generally applicable any law that neither mentions religion nor expressly imposes different rules on religious individuals. That is not the law. *See Fulton*, 141 S. Ct. at 1878; *Lukumi* 508 U.S. at 534.

The District Court declared that, even if the plaintiffs "could allege the policy lacks neutrality or general applicability, they have not plausibly alleged a substantial burden on their religious practice." Order, R.94, PageID#2035. The court reasoned that, because "both religious and non-religious students have access to the communal bathrooms and single occupancy bathrooms," no student is denied the "equal share of the rights, benefits, and privileges" afforded to other students." *Id.*, PageID#2036 (quotation omitted). Thus, the argument apparently goes, the plaintiffs failed to allege a substantial burden on their religious practice.

That argument fails. For one thing, even facially neutral laws can impermissibly burden religious practice when they force individuals to choose between their beliefs and acceptance of a public benefit. After all, Jewish and Muslim prisoners served only pork can claim a burden on their religious practice regardless of whether the same meal is offered to everyone. *See, e.g.*, *Ackerman v. Washington*, 16 F.4th 170, 185 (6th Cir. 2021). Regardless, a "plaintiff may carry the burden of proving a free exercise violation in various ways, including by showing that a government entity has

burdened his sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'" *Kennedy*, 597 U.S. at 525 (citation omitted). Here, the plaintiffs alleged that the policy, which is neither neutral nor generally applicable, burdens their sincere religious beliefs. *See* Compl., R.1, PageID#11–15. To the extent the District Court thought the plaintiffs needed to allege anything further, it erred.

**2.** The District Court never addressed the plaintiffs' claim under Article I, §7 of the Ohio Constitution. Instead, it refused to exercise supplemental jurisdiction over that claim. Under 28 U.S.C. §1367(c)(3), a district court may refuse to exercise supplemental jurisdiction over state-law claims after "dismiss[ing] all claims over which it has original jurisdiction." After the District Court dismissed the plaintiffs' federal claims, it invoked §1367(c)(3) and declined to exercise jurisdiction over the plaintiffs' claim alleging a violation of Article I, §7.

Because the District Court erred in dismissing the plaintiffs' federal claims, *see above* 19–26 & *below* 33–58, this Court must, at minimum, reverse the dismissal of the state-law claims and "remand" so that the District Court can "re-examine whether to exercise its discretion to hear any of the remaining state law claims." *Grubbs*, 807 F.3d at 806; *see also Veneklase*, 670 F.3d at 716.

However, it would be better for the Court to simply reverse with instructions to consider the claim, because refusing to consider it would be an abuse of discretion.

31

Section 1367 identifies situations in which "district courts *may* decline to exercise supplemental jurisdiction" over a state-law claim. §1367(c) (emphasis added). But it never *requires* courts to decline jurisdiction. Here, the sound exercise of discretion requires accepting jurisdiction. *Cf. Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 94 (2014). For one thing, the Article I, §7 claim is intertwined with the plaintiffs' standing to bring their Title IX claim, as explained in greater detail below. The District Court would abuse its discretion by refusing to decide a properly raised state-law claim intertwined with a standing argument the court must consider.

Moreover, none of the four factors enumerated in §1367(c) would justify declining to exercise jurisdiction. *First*, the claim does not "raise[] a novel or complex issue of State law." §1367(c)(1). All the federal courts must do is apply the settled law to the facts established at trial. Further, this Court may opt to certify the question whether the plaintiffs alleged a violation of Article I, §7 to the Supreme Court of Ohio. *See In re Nat'l Prescription Opiate Litig.*, 82 F.4th 455, 461 (6th Cir. 2023). That would crystallize the provision's meaning, leaving no "novel or complex issue of State law" for the District Court to address on remand. §1367(c)(1). *Second*, there is no reason to suspect the claim will "substantially predominate[] over the claim or claims over which the district court has original jurisdiction." §1367(c)(2). Indeed, the plaintiffs' entitlement to relief will turn on the same evidence as the free-exercise

claim. *Third*, because the District Court erred by dismissing the plaintiffs' federal claims, the exception for cases in which "the district court has dismissed all claims over which it has original jurisdiction" no longer applies. §1367(c)(3). *Finally*, no "exceptional circumstances" militate against asserting supplemental jurisdiction. §1367(c)(4). Indeed, the interrelationship between the merits of the Article I, §7 claims and the standing issue pertaining to the Title IX claim demands the exercise of supplemental jurisdiction.

\*

The District Court erred by dismissing the plaintiffs' religious-liberty claims. This Court should reverse the District Court's judgment as to these claims.

## II. The plaintiffs have Article III standing to seek a declaratory judgment.

Bethel adopted the challenged policy because a majority of its members, based on the advice of legal counsel, believed Title IX required allowing transgender students to use the same restrooms as students of the opposite sex. *See* Compl., R.1, PageID#3, 9; Order, R.94 PageID#2003–04.

Bethel received bad advice. Title IX commands that no one, "on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. §1681(a). This text does not require educators to take a sex-

blind approach to their students; it does not, unlike Title VII and other anti-discrim-ination laws, *see, e.g.*, *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1739 (2020), prohibit distinctions bearing a but-for causal relationship to biological sex.  More nearly the opposite is true.  Title IX often *requires* schools to make sex-based distinctions to en-sure that women are not excluded from, or denied the benefits of, educational pro-grams.

Consider sports.  Because there are "enduring" "physical differences between men and women," *United States v. Virginia*, 518 U.S. 515, 533 (1996), providing women with equal athletic opportunities sometimes means hosting sex-segregated teams.  If "teams theoretically open to all on a competitive basis result in exclusion of women from athletic participation, separate teams for women … are certainly re-quired by the statute itself."  Comment, *Implementing Title IX: The New Regulations*, 124 U. Pa. L. Rev. 806, 840 (1976).

Similar logic applies to sex-based distinctions relevant to restrooms and other areas where the sexes might reasonably demand privacy.  Human societies have seg-regated restrooms by sex for millennia.  *See* W. Burlette Carter, *Sexism in the "Bath-room Debates": How Bathrooms Really Became Separated by Sex*, 37 Yale L. & Pol'y Rev. 227, 229 (2019).  Their doing so does not reflect outdated "prudishness."  Op. of Ohio Att'y Gen., No. 2023-0006 (May 26, 2023), https://perma.cc/E7TT-WSP5.

34

Rather, it reflects an honest understanding of the enduring physical differences between the sexes, along with the (resulting) "privacy interests in using the bathroom away from the opposite sex and in shielding [one's] bod[y] from the opposite sex." *Adams*, 57 F.4th at 804. Forcing students of both sexes to share restrooms undermines this privacy interest, potentially denying students (especially female students) equal access to educational benefits "on the basis of sex."

It is thus unsurprising that Title IX, since its inception, has been interpreted to permit sex-segregated restrooms. *See* 34 C.F.R. §106.33; *Adams*, 57 F.4th at 811–15. True, one stay-stage decision from this Court expressed openness to holding that Title IX entitles transgender students to use restrooms designated for people of the opposite sex. *Dodds v. Dep't of Educ.*, 845 F.3d 217, 221 (6th Cir. 2016) (*per curiam*). But it never resolved the question, creating no binding precedent on the issue. And its cursory reasoning underlying its openness to this resolution has been ably rebutted, first in a dissenting opinion by Judge Sutton and later by the *en banc* Eleventh Circuit. *See id.* at 222–24 (Sutton, J., dissenting); *Adams*, 57 F.4th at 811–15. In sum, correctly interpreted, Title IX did not require Bethel to adopt the challenged policy.

In fact, Bethel *violated* Title IX when it adopted its new policy. In Bethel, sex-segregated communal restrooms are "a longstanding educational benefit." Compl., R.1, PageID#21. That is, Bethel has long segregated the restrooms based on

biological sex to ensure that both sexes have an equal opportunity to learn. This en-sures that neither sex, as a cost to be paid for attending school, must either avoid restrooms or suffer the anxiety associated with sharing intimate spaces with the op-posite sex. Further, by segregating the sexes in these spaces, Bethel reduced the risk of having its students exposed to sexual harassment. All told, the original policy en-sured that no one would, "on the basis of sex," be excluded from, denied the benefits of, or discriminated under any educational program. 20 U.S.C. §1681(a). When Bethel adopted its new policy, it revoked that longstanding accommodation. It thus denied boys and girls access to sex-segregated restrooms. And it did so without providing suitable alternatives, such as single-occupancy restrooms sufficient in number to satisfy the needs of the student population. That constitutes backsliding; by eliminating its safeguard against sex discrimination without erecting an alterna-tive, Bethel subjected students to discrimination "on the basis of sex" under a feder-ally funded educational program, violating Title IX.

At least, that is the plaintiffs' argument. *See* Resp. in Opp. to Mot. to Dismiss, R.81, PageID#1689–91, 1698. Here, the question is not whether the plaintiffs are right about the meaning of Title IX. Instead, this Court must decide whether Article III bars the plaintiffs from having their day in court. Article III does no such thing and the District Court erred by holding otherwise.

### A.   The parents and students alleged facts establishing Article III standing to bring a Title IX claim.

**1.**   The Constitution empowers federal courts to decide only "Cases" and "Controversies." *See* U.S. Const., art. III, §2. "To state a case or controversy under Article III, a plaintiff must establish standing." *SFFA*, 600 U.S. at 199 (quotation omitted). "That, in turn, requires a plaintiff to demonstrate that it has (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (quotation omitted).

Each of these elements deserves a bit of elaboration.

First, consider the "injury-in-fact requirement," which requires some "de facto, actually existing, real-world harm." *Charlton-Perkins v. Univ. of Cincinnati*, 35 F.4th 1053, 1060 (6th Cir. 2022) (quotation omitted, alteration accepted). Whether plaintiffs "suffered an injury in fact does not necessarily hinge upon the substantive requirements of any particular cause of action." *Id.* Instead, plaintiffs must show that they "suffered a concrete and particularized injury in connection with the conduct about which [they] complain[]." *Trump v. Hawaii*, 138 S. Ct. 2392, 2416 (2018).

The "fairly traceable" requirement obligates the plaintiff to "demonstrate a causal connection between his injury and the defendant's conduct." *Binno v. Am. Bar Ass'n*, 826 F.3d 338, 344 (6th Cir. 2016).

Finally, the redressability element is satisfied when it is "'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (citation omitted).  Likely redressability does not entail certain redressability; it is enough that the sought-after order will deter the plaintiff from inflicting the injury in fact.  Consider, for example, *Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*, 528 U.S. 167 (2000). There, private plaintiffs sued alleged polluters under the Clean Water Act, seeking the imposition of civil fines.  Although the fines would be paid to the government, not to the plaintiffs, the Court determined that the plaintiffs satisfied the redressability requirement; the fines, by deterring future pollution, would likely prevent further injuries to the plaintiffs' interest in protecting the area's cleanliness.  *Id.* at 185–86.

**2.**  The plaintiffs carried their burden to allege facts establishing each element.

***Injury in fact.***  The plaintiffs satisfied the injury-in-fact requirement for two independent reasons.

*First*, the student plaintiffs alleged that the challenged policy interferes with their pursuit of an education.  Specifically, the student plaintiffs alleged that, because of the policy, they hold their urine at school.  Compl., R.1, PageID#14.  Further, when the students use the restroom, they experience anxiety and emotional distress.  *Id.*, PageID#12, 14.  And relatedly, the students suffer a dignitary harm from being forced

to compromise their senses of modesty by sharing restrooms with the opposite sex.
*Id.*

These are precisely the sort of intangible interferences with "access to the educational opportunities or benefits provided by the school" that this Court has treated as Article III injuries in Title IX cases. *Kollaritsch*, 944 F.3d at 622 (quotation omitted); *cf. Gerber v. Herskovitz*, 14 F.4th 500, 506 (6th Cir. 2021) (relying on emotional distress to establish injury in fact for a constitutional cause of action). Indeed, these "emotional and dignitary" harms are *the very same* alleged injuries that give transgender students standing to challenge sex-segregated-restroom policies under Title IX. *See, e.g.*, *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 617–18 (4th Cir. 2020). And "in the law, what is sauce for the goose is normally sauce for the gander." *Heffernan v. City of Paterson,* 578 U.S. 266, 272 (2016).

*Second*, all plaintiffs contend that the policy deprives them of constitutional rights. Specifically, each parent and student plaintiff alleges that the policy violates either their federal constitutional right to "the free exercise" of religion, U.S. Const., am. I, their due-process right to direct the upbringing of their children, *see below* 45–58, or their state constitutional right to live free from governmental "interference with the rights of conscience," Ohio Const., art. I, §7. The deprivation of those rights constitutes an injury in fact because the denial of a constitutional right *always*

39

constitutes an injury in fact.  *See New Doe Child #1*, 891 F.3d at 586; *McGlone v. Bell*, 681 F.3d 718, 729 (6th Cir. 2012).  Critically, the "standing inquiry is not a merits inquiry."  *Gerber*, 14 F.4th at 505.  Unless a claim is "utterly frivolous," *id.*, courts assessing the standing must assume that the alleged facts, if proven, "would be adjudged violative of the [plaintiffs'] constitutional rights."  *Kanuszewski v. Michigan Dep't of Health & Hum. Servs.*, 927 F.3d 396, 407 (6th Cir. 2019) (quotation omitted). For present purposes, that means the Court must assume the plaintiffs will succeed in showing that the alleged conduct violates the First Amendment, the Due Process Clause, and Article I, §7 of the Ohio Constitution.  Those violations establish an injury in fact.

*Traceability*.  The plaintiffs alleged a direct "causal connection between" their injury and the challenged policy.  *Binno*, 826 F.3d at 344.  Were Bethel to abandon its policy, each of the above harms would vanish.

*Redressability.*  The plaintiffs established redressability.  As an initial matter, the plaintiffs alleged, and the available evidence confirms, that the school board adopted the policy only because of a mistaken belief that Title IX requires allowing transgender students to use the same restroom as students of the opposite sex.  *See* Compl., R.1, PageID#3, 9, 19; *see also* Mansfield Decl., R.18-3, PageID#636; Second Byrne Decl., R.58-1, PageID#1289; Firks Decl., R.48-1, PageID#1052–53; Ex. BOE

502-507 - FAQ, R.39-6, PageID#960.  Were the plaintiffs to prevail in proving that Title IX requires no such thing, Bethel would have no reason to continue maintaining the policy that is injuring the plaintiffs.  And by prevailing, the plaintiffs would secure a judgment protecting their interests, which they could defend by intervening in any litigation arguing that Title IX compels the challenged policy.  The prospect of subsequent litigation is real; in this very litigation, one interested party (Roe) intervened to defend the challenged policy after earlier raising the prospect of bringing legal action unless Bethel adopted something like the challenged policy.  Order, R.94, PageID#2000.

In any event, any favorable decision will necessarily redress the plaintiffs' injuries.  On the one hand, they may win a declaration that Title IX does not require the challenged policy.  That would redress their injuries, because if Title IX does not compel the policy, the policy is indefensibly illegal and Bethel has no choice but to abandon it.  Again, the Ohio Constitution forbids Bethel from continuing its policy.  *See above* 26–28.  Bethel would presumably insist that Title IX prohibits it from following state law.  Of course, Title IX is Spending Clause legislation; it binds only schools that accept federal funding.  *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 181–82 (2005).  Thus, the proper response to any conflict between state law and Spending Clause legislation is to turn down the federal money and abide by state law.

41

*See* Philip Hamburger, *Purchasing Submission: Conditions, Powers, and Freedom* 131–32 (2021).  Regardless, a judgment declaring that Title IX permits sex-segregated restrooms would eliminate any conflict between Title IX and Ohio law, erasing Bethel's defense for violating state law.  At that point, Bethel would have no choice but to abandon its new policy, curing the plaintiffs' injuries.

The plaintiffs have one other way to prevail: they can show that Bethel's policy change *violates* Title IX.  *See above* 35–36; *see also* Resp. in Opp. to Mot. to Dismiss, R.81, PageID#1689–91, 1698.  A declaratory judgment establishing that Title IX forbids Bethel from maintaining its policy—that it "expressly provides for separate" restrooms 'based on biological sex," Compl., R.1, PageID#25—would redress the plaintiffs' injuries.

Ultimately, it is "'likely,' as opposed to merely 'speculative,' that" a favorable decision would redress the plaintiffs' injuries.  *Lujan*, 504 U.S. at 561 (citation omitted).

**B.    The District Court erred in holding that the plaintiffs lacked standing to seek a declaratory judgment.**

The District Court (with a possibly relevant exception discussed below) treated the Rule 12(b)(1) motions as presenting facial attacks, not factual attacks, on the plaintiffs' standing.  *See above* 16–17 (exploring the difference).  It then dismissed

42

the Title IX claim after determining that the plaintiffs failed to allege facts that, if true, would establish the injury-in-fact and redressability factors. It erred.

*Injury in fact.* The District Court seemed to think that, to satisfy the injury-in-fact requirement, the plaintiffs needed to contend that the challenged policy violated Title IX. According to the District Court, the plaintiffs alleged and argued only that the original policy *complied with* Title IX, not that the challenged policy *violated* Title IX. On this basis, the court determined that the plaintiffs failed "to show a concrete, particularized Title IX injury." Order, R.94, PageID#2014–15.

This analysis is doubly flawed. First, the District Court erred because the plaintiffs argued that the challenged policy violated Title IX. *See* Resp. in Opp. to Mot. to Dismiss, R.81, PageID#1689–91, 1698. The District Court never grappled with that reality, and instead treated the argument as though it had never been developed. *See* Order, R.94, PageID#2018. Second, and more fundamentally, the injury-in-fact requirement demands a real-world injury, not a "Title IX injury." *Id.*, PageID#2014–15. The injury-in-fact analysis does not "hinge upon the substantive requirements of any particular cause of action." *Charlton-Perkins*, 35 F.4th at 1060. Instead, it requires proof of a *de facto* injury—a concrete injury in the real world—stemming from the challenged action. *Id.* Here, the challenged action is Bethel's

43

policy, which actually injures the plaintiffs for the reasons laid out above.  That satisfies the injury-in-fact requirement.

*Redressability.*  The District Court found the plaintiffs' redressability-related allegations too speculative to satisfy Article III.  It reasoned that, because "the School District could decide to afford transgender students *more rights* than Title IX provides, … any decision on whether the policy comports with Title IX" would be "superfluous" and lack "real legal effect."  *Id.*, PageID#2015 (emphasis in original).

This reasoning fails.  For one thing, Bethel adopted the policy only because it believed Title IX required it to.  *See* Compl., R.1, PageID#3, 9, 19; Mansfield Decl., R.18-3, PageID#636; Second Decl. of Julie E. Byrne, R.58-1, PageID#1289; Decl. of Firks, R.48-1, PageID#1052–53; Ex. BOE 502-507 - FAQ, R.39-6, PageID#960.  Insofar as the District Court read Bethel's filings to "intimate" otherwise, Order, R.94, PageID#2015, it erred.  Nothing in the record suggests Bethel would respond to a declaratory judgment by "afford[ing] transgender students more rights than Title IX provides." *Id*.  The declarations the District Court cited in hypothesizing otherwise either fail to address the issue, *see* Elam Decl., R.18-1, PageID#630; King Decl., R.18-2, PageID#632; Sebastian Decl., R.18-4, PageID#639, or shows that the school board acted based on its flawed understanding of Title IX, *see* Mansfield Decl., R.18-3, PageID#636; Chrispin Decl., R.18-5, PageID#642.  So even if the District Court's

suggestions are construed as findings relating to a factual attack on standing—and that is not the best reading of the opinion below—those findings are clearly erroneous and constitute reversable error.

Regardless, as explained above, any favorable ruling for the plaintiffs will establish either that Title IX prohibits Bethel's policy or that Title IX comports with state law prohibiting the policy. *See above* 41–42. Either way, Bethel would have no choice but to abandon the policy, redressing the plaintiffs' injuries.

\*

The District Court erred by dismissing the plaintiffs' Title IX claim for lack of standing. This Court should reverse the District Court's judgment on this count.

## III. The parent plaintiffs adequately pleaded a claim that Bethel violated their fundamental right to control the upbringing of their children.

The Due Process Clause protects parents' "fundamental right … to make decisions concerning the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 66 (2000) (plurality). This includes the right "to direct the upbringing and education of children under their control." *Pierce*, 268 U.S. at 534–35.

According to the Sixth Circuit, "this right plainly extends to the public school setting." *Blau*, 401 F.3d at 395. But according to the District Court, it does not. The District Court said that parents' fundamental right to direct the education of their children consists *exclusively* of a right to homeschool one's child or to enroll that child

45

in a private school.  Order, R.94, PageID#2025.  This leaves parents with no rights at all in the "public school setting."  *Blau*, 401 F.3d at 395.

The District Court erred.  The right to direct the education of one's child is broader than the court believed.  And when the right's scope is properly understood, the parents alleged facts sufficient to state a claim for relief.

**A.**  The Due Process Clause forbids the government from "depriv[ing] any person of life, liberty, or property[] without due process of law."  U.S. Const., am. XIV; *see also* U.S. Const., am. V.  The Supreme Court has long understood this language to "guarantee[] more than fair process."  *Glucksberg*, 521 U.S. at 719.  "The Clause also includes a substantive component that 'provides heightened protection against government interference with certain fundamental rights and liberty interests.'"  *Troxel*, 530 U.S. at 65 (plurality) (quoting *Glucksberg*, 521 U.S. at 720).  "The liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by" the Supreme Court.  *Id*.  This section explores the history and contours of that fundamental right before applying it to this case.

**1.**  "In civilized countries, the family is the unit of the social order."  *Richards v. Forrest*, 278 Mass. 547, 553 (1932).  And within this foundational societal unit,

"[t]he parent has the right" and "duty to maintain and protect" his child. *People ex rel. O'Connell v. Turner*, 55 Ill. 280, 284 (1870).

Centuries of legal doctrine reflect this "principle of natural law." *Id.* "By the fourteenth and fifteenth centuries, canon law and civil law texts alike spoke about a child's right to life and the means to sustain life." John Witte, Jr., *The Nature of Family, the Family of Nature: The Surprising Liberal Defense of the Traditional Family in the Enlightenment*, 64 Emory L.J. 591, 613 (2015). As time progressed, the law consistently recognized that parents have a duty and a right to care for their children. Blackstone, I *Commentaries on the Laws of England*, ch.16 at 435–38 (1765); Kent, II *Commentaries on American Law* 169 (1827); *Banse v. Muhme*, 7 Ohio C.D. 224, 225–26 (Ohio Cir. Ct. Jan. 28, 1897). Early American common law followed suit. *Stanton v. Wilson*, 3 Day 37, 51 (Conn. 1808).

A parent's right and duty goes beyond ensuring his child's survival. Parents have long had a right and duty to provide their children with "an education suitable to their station in life." Blackstone, I *Commentaries* at 438. No parent, Blackstone wrote, would "confer[] any considerable benefit upon his child, by bringing him into the world; if he afterwards entirely neglects his culture and education, and suffers him to grow up like a mere beast, to lead a life useless to others, and shameful to himself." *Id.* at 439. Parents thus assume a duty to educate their children. And the

duty to educate presupposes a power to direct the child's education. *Id*. at 440; *see also Moritz v. Garnhart*, 7 Watts 302, 303 (Pa. 1838) (describing a case holding "that a putative father has a natural right to the care and education of his illegitimate child"). Parental authority included a "right to direct what studies, included in the prescribed course, [one's] child shall take." *Morrow v. Wood*, 35 Wis. 59, 64 (1874). Parents—not the government—possess this power. The "fact that the children might be better educated … with some one else than the parent can have no weight … as against the natural rights of the parent." *In re Neff*, 20 Wash. 652, 655 (1899).

This history undergirds the "fundamental right[] … to direct the education and upbringing of one's children, *Glucksberg*, 521 U.S. at 720, which the Supreme Court first recognized in *Meyer v. Nebraska*, 262 U.S. 390 (1923). There, the Court reversed a state-court conviction under a law that forbade public and private schools from teaching foreign languages before eighth grade. This law, the Court reasoned, interfered with parents' freedom to "establish a home and bring up children," *id*. at 399, along with parents' "power … to control the education of their own," *id*. at 401. Two years later, the Court again invoked "the liberty of parents and guardians to direct the upbringing and education of children under their control," affirming an order enjoining an Oregon law that forbade students from attending private schools. *Pierce*, 268 U.S. at 534–35. A "child," the Court observed, "is not the mere creature of the

48

State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." *Id*. at 535.

These decisions, resting as they do on the "history and culture of Western civilization," *Yoder*, 406 U.S. at 232, remain viable. Indeed, subsequent cases have recognized the right's application in distinct contexts. One case limits the States' power to give grandparents visitation rights over parental objections. *Troxel*, 530 U.S. at 67–68 (plurality), 77–79 (Souter, J., concurring in judgment), 80 (Thomas, J., concurring in judgment). Another recognizes that parents have a right to direct their children's medical treatment—a right the government violates if, without obtaining "informed parental consent," it retains children's blood samples for use by third parties. *Kanuszewski*, 927 F.3d at 420.

This Court has acknowledged that parents' "'fundamental right … to make decisions concerning the care, custody and control of their children' …. plainly extends to the public school setting." *Blau*, 401 F.3d at 395. That is why public-school officials may violate the Constitution by withholding information about a serious, non-academic matter—a student's pregnancy, for example—if doing so "obstruct[s] the parental right to choose the proper method of resolution." *Gruenke*, 225 F.3d at 306. And that is why the government is limited in its ability to mandate that students

receive education contrary to the "moral standards, religious beliefs, and elements of good citizenship" their parents hope to "inculcat[e]." *Yoder*, 406 U.S. at 233.

None of this is to say that the "rights of parenthood are beyond limitation." *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944). Far from it. For example, while a parent's right to direct his child's medical care includes the right to *refuse* treatment, *see Kanuszewski*, 927 F.3d at 420, parents have no right to demand the administration of an illegal drug or procedure, as "there is no historical support for an affirmative right to specific treatments." *L.W. by and through Williams v. Skrmetti*, 83 F.4th 460, 476 (6th Cir. 2023). And while parents "have a fundamental right to decide *whether* to send their child to a public school, they do not have a fundamental right generally to direct *how* a public school teaches their child." *Blau*, 401 F.3d at 395 (emphasis in original). Understandably so, as pedagogical decisions do not "arrogat[e] … the parental role" in the same way as decisions about the handling of issues affecting a student's personal life, and thus do not similarly invade "the fundamental rights of parents to bring up their children." *Gruenke*, 225 F.3d at 306–07. Finally, not all actions that implicate the fundamental right to control the upbringing and education of one's child violate the Constitution; infringements of this right "are subject to strict scrutiny," and will be upheld if "they are narrowly tailored to a compelling governmental interest." *Kanuszewski*, 927 F.3d at 419 (quotation omitted).

In the end, the substantive-due-process right to direct the upbringing of a child cannot be reduced to an easily applied, bright-line rule.  In each case, courts ask whether the State has usurped decisionmaking authority historically and traditionally reserved to parents.  If the State usurps that authority, the usurpation is unconstitutional unless it satisfies strict scrutiny.

**B.**  Now turn to this case.  Ohio law guarantees every child an education.  The General Assembly must provide "a thorough and efficient system of common schools."  Ohio Const., art. VI, §2.  And parents must enroll their children in school—either a public school or, if they have adequate means and options, homeschool or a private school.  Ohio Rev. Code §3321.04.  The parents in this case elected to fulfill this requirement by enrolling their children in Bethel's public schools.  These parents thus entrusted their children to Bethel's care.  Bethel, however, adopted the challenged policy; it made the non-academic decisions to require that children share communal restrooms with children of the opposite sex and to hide important details about the policy's operation from concerned parents.  In so doing, Bethel unconstitutionally "arrogat[ed] … the parental role."  *Gruenke*, 225 F.3d at 306.  This follows from three related insights.

*First*, the challenged policy forces students in Bethel's charge to live in a manner contrary to the "moral standards" and "religious beliefs" that the parents hope

51

to "inculcate." *Yoder*, 406 U.S. at 233. Many of the parents sincerely believe that allowing the sexes to share restrooms and other sensitive areas contravenes God's will. Compl., R.1, PageID#11–15. Thus, these parents must either forego their state-law right to a public education—an option only for those with the means to support homeschool or a private education—or else send their kids to a public school operated "in sharp conflict with the fundamental mode of life mandated by [their] religion." *Yoder*, 406 U.S. at 217. That conflict matters a great deal to the legal analysis. For "when the interests of parenthood are combined with a free exercise claim of the nature revealed by this record," parental rights are afforded heightened protection. *Id.* at 233; *see also Smith*, 494 U.S. at 881 n.1.

*Second*, the challenged policy increased the risk that the plaintiffs' children would be placed in physical danger. *See* Compl., R.1, PageID#8, 16–17, 20. At the very least, it created risks of the sort that implicate the parental "duty to maintain and protect" one's child. *O'Connell*, 55 Ill. at 284. As explained above, societies the world over have long segregated restrooms by sex because of dangers and innate privacy desires stemming from biological differences between the sexes. *See Adams*, 57 F.4th at 805. Restrooms are sensitive places in which people may find themselves in vulnerable positions. Allowing both sexes to access the same communal restrooms makes it easier for predators to take advantage of that vulnerability. "After all, if

bathrooms are not separated by sex, otherwise-concerned observers are less likely to think twice or to intervene, when a [male] enters a women's [or girl's] room." Op. of Ohio Att'y Gen., No. 2023-0006 at 14, https://perma.cc/E7TT-WSP5.  Recent events confirm the wisdom of this common-sense insight.  *See e.g.*, Report of the Special Grand Jury on the Investigation of Loudoun County Public Schools, *In re: Special Grand Jury Proceedings*, Case No. CL-22-3129 (Va. Cir. Ct. Loudon Cnty. 2022), https://perma.cc/KQ9F-RP9Q.

Beyond the immediate threat these policies pose, such policies teach children to resist their instincts regarding the presence of opposite-sex people in sensitive spaces.  These policies, in other words, teach children not to question behavior that should raise red flags.  And that exposes them to risk by training them, however inadvertently, to ignore real dangers.

*Finally*, the school refused to provide the parents with the information they needed to assess the degree to which the policy would undermine their values and risk their children's safety.  Would adults be allowed to share communal restrooms with children of the opposite sex during school hours?  What about during athletic events?  What steps would the school take to ensure that only transgender students (as opposed to non-transgender students looking to harass or harm peers) used restrooms for the opposite sex?  How would students, faculty, and staff identify these

individuals?  What rules would apply to overnight trips?  Would the rules vary depending on age?  Compl., R.1, PageID#17.  These are all reasonable questions.  Had the school answered these questions, it would have at least allowed the parents to make an informed decision about how best to respond.  Parents, armed with complete information, could intelligently determine whether to remove their children from the school, take additional steps to protect their children's values and safety, or pursue some other option.  Yet, the school refused to provide this information.  *Id.*

All told:  after making a decision bearing on students' moral upbringing and safety—the core of parental rights—Bethel refused to provide the parents with information they needed to evaluate the degree of interference and to "choose the proper method of resolution."  *Gruenke*, 225 F.3d at 306.  Although "schools at times stand *in loco parentis*, *i.e.*, in the place of parents," *Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 141 S. Ct. 2038, 2045 (2021), they "must not forget that '*in loco parentis*' does not mean 'displace parents.'"  *Gruenke*, 225 F.3d at 307.  "It is not educators, but parents who have primary rights in the upbringing of children.  School officials have only a secondary responsibility and must respect these rights."  *Id.*  When Bethel seized the power to make so sensitive a decision, free from parental oversight, it "overstep[ped] the boundaries of school authority and impermissibly usurp[ed] the fundamental rights of parents to bring up their children."  *Id.*

54

Because the challenged policy interferes with the parents' fundamental rights, it may be upheld only if it survives strict scrutiny. The policy cannot survive review under that exacting standard. Since the challenged policy is not narrowly tailored to promote a compelling interest, *see above* 24–25, neither is the school's adopting it while refusing to answer parents' questions.

**C.** The District Court dismissed the plaintiffs' claim under Rule 12(c). It acknowledged that parents "have a right to make the initial choice about where their child attends school." Order, R.94, PageID#2025. But that initial choice, the District Court concludes, is all that the right to direct the education of one's child includes. Accordingly, schools can adopt any policy "direct[ing] school operations" that they like; no such policy, the court reasoned, will infringe the fundamental right to control the upbringing of one's child. *Id.*, PageID#2022. Parents do not even have any right to information about school policies, since "a school's refusal to answer concerned parents' potential questions does not deprive them of" the right "to remove" the child from the school and enroll him elsewhere. *Id.*, PageID#2025.

The District Court erred. First, binding precedent forecloses any argument that the fundamental right at issue consists *exclusively* of the right to "make the initial choice about where [one's] child attends school." *Id.* In *Meyer*, for example, the Supreme Court struck down a Nebraska law that banned the teaching of foreign

language before eighth grade. 262 U.S. at 403. That law violated the Fourteenth Amendment not because it denied parents the ability to choose their children's schools, but rather because it denied parents the choice to enroll the child in a particular course of study. *Id*. at 401. And the law applied to public schools as well as private schools. *Id*. at 397. Or consider *Yoder*, which held that Amish parents had a right not to enroll their high-school-age children in any school. 406 U.S. at 234. As for this Court, the key case observed that "this right" to direct the education of one's child "plainly extends to the public school setting." *Blau*, 401 F.3d at 395. In other words, the fundamental right applies in public schools. That forecloses any argument that the right consisted exclusively of a right to choose a school.

Beyond contradicting precedent, the District Court's reasoning contradicts the nature of parental rights. The right to control a child's education is not a freestanding right. It is, instead, part of the broader right to direct the "care, custody, and control" of one's child. *Troxel*, 530 U.S. at 65 (plurality); *see also Glucksberg*, 521 U.S. at 720. That broader right extends well beyond education. The Supreme Court, for example, has invoked the right to strike down a state law giving grandparents broad power to seek visitation rights over parental objections. *Troxel*, 530 U.S. at 75 (plurality). It would be bizarre for this broader right to exhaust itself in the educational context upon a child's enrollment. That would mean that a school could,

without implicating the fundamental right to control the upbringing of children, al-low grandparents to visit students at lunch over parental objections. *Contra id.* It would mean that school officials could usurp the parental role by requiring students to take pregnancy tests and then directing the management of any pregnancy, all without ever telling affected students' parents. *Contra Gruenke*, 225 F.3d at 307. Un-less the fundamental right to control the upbringing of one's child is uniquely weak-ened in the education context—an unprincipled exception—the right cannot be as narrow as the District Court suggested.

Finally, turn to the District Court's conclusion that "a school's refusal to an-swer concerned parents' … questions does not deprive them of" the right to decide where to send their children to school, since the parents "still have the option to re-move [their children] from that school." Order, R.94, PageID#2025.

This analysis is doubly flawed. First, it rests on the flawed premise that the relevant right consists exclusively of a right to decide *whether* one's child will attend public school. Second, it mistakenly concludes that any hindrance short of complete deprivation is constitutionally irrelevant. That is not true in any other context. A special use tax on ink violates the freedom of the press, *Minneapolis Star & Trib. Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 581 (1983), regardless of whether newspapers could pay the tax without going bankrupt. And because the "right to

possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use," laws limiting access to range training implicate the Second Amendment. *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011). The same goes for laws limiting ownership of ammunition. *See Herrington v. United States*, 6 A.3d 1237, 1243 (D.C. 2010). The "Constitution deals with substance, not shadows." *SFFA*, 600 U.S. at 230. A law that keeps citizens from accessing what they need to fully exercise a right is, in substance, a restriction on the right itself.

So too in the parental rights context. Even assuming that the fundamental right to direct the education of one's child consists *exclusively* of the right to decide which school that child will attend, that narrow right would "impl[y] a corresponding right to acquire," *Ezell*, 651 F.3d at 704, the information needed to wield the right intelligently. By denying parents that information, Bethel violated the Constitution.

# CONCLUSION

The Court should reverse the District Court's judgment dismissing the plaintiffs' religious-liberty, due-process, and Title IX claims.

February 14, 2024

Nicholas Barry
AMERICA FIRST
LEGAL FOUNDATION
611 Pennsylvania Ave., SE #231
Washington, DC 200003
615.431.3903
Nicholas.barry@aflegal.org

*/s/ Benjamin M. Flowers*
Benjamin M. Flowers
  *Counsel of Record*
Joseph P. Ashbrook
Julie E. Byrne
ASHBROOK BYRNE KRESGE LLC
P.O. Box 8248
Cincinnati, Ohio 45249
513.201.5775
bflowers@ashbrookbk.com

*Counsel for Plaintiffs-Appellants*

# CERTIFICATE OF COMPLIANCE

I certify, as required by Rule 32(g) of the Federal Rules of Appellate Procedure, that this document complies with the type-volume requirements of Fed. R. App. P. 32(a)(7)(B)(i) because it contains 12,997 words.

I further certify that this motion complies with the typeface requirements of Federal Rule 32(a)(5) and the type-style requirements of Federal Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Equity font.

*/s/ Benjamin M. Flowers*
Benjamin M. Flowers

## CERTIFICATE OF SERVICE

I certify that on February 14, 2024, I filed this motion electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties for whom counsel has entered an appearance. Parties may access this filing through the Court's system.

*/s/ Benjamin M. Flowers*
Benjamin M. Flowers

# DESIGNATION OF RELEVANT DOCUMENTS

*John and Jane Doe No. 1, et al. v. Bethel Local Sch. Dist. Bd. of Ed., et al.,*
No. 3:22-cv-00337 (S.D. Ohio)

| Docket Entry No. | Description | PageID# |
|---|---|---|
| 1 | Complaint | 1–27 |
| 13-1 | Declaration of Anne Roe | 119–29 |
| 17-2 | Transcript of January 10, 2022 Board Meeting | 592–97 |
| 18-1 | Declaration of Danny Elam | 630–31 |
| 18-2 | Declaration of Jacob King | 632–34 |
| 18-3 | Declaration of Lydda Mansfield | 635–38 |
| 18-4 | Declaration of Lori Sebastian | 639–40 |
| 18-5 | Declaration of Matthew Chrispin | 641–43 |
| 39 | Defendants' Answer | 836–55 |
| 39-6 | Exhibit BOE 502-507 - FAQ | 959–64 |
| 48-1 | Declaration of Justin Firks | 1052–79 |
| 58-1 | Second Declaration of Julie E. Byrne | 1286–91 |
| 75 | Defendant-Intervenor Anne Roe's Motion to Dismiss for Lack of Subject Matter Jurisdiction and Motion for Judgment on the Pleadings | 1588–1635 |
| 79 | Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction and Motion for Judgment on the Pleadings | 1651–66 |
| 81 | Plaintiffs' Response in Opposition to Defendant-Intervenor Anne Roe's Motion to Dismiss for Lack of Subject Matter Jurisdiction and Motion for Judgment on the Pleadings | 1670–1736 |
| 85 | Plaintiffs' Response in Opposition to Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction and Motion for Judgment on the Pleadings | 1742–63 |
| 87 | Reply in Support of Defendant-Intervenor Anne Roe's Motion to Dismiss for Lack of Subject Matter Jurisdiction and Motion for Judgment on the Pleadings | 1801–47 |

| 88 | Reply in Support of Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction and Motion for Judgment on the Pleadings | 1848–57 |
|----|----|----|
| 90 | Oral Argument Transcript | 1863–1962 |
| 94 | Order Dismissing Case and Final Judgment | 1998–2049 |
| 95 | Notice of Appeal | 2050–51 |