Case No. 23-3740

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

---

### JOHN AND JANE DOE NO. 1, et al.,

*Plaintiffs-Appellants,*

**v.**

### BETHEL LOCAL SCHOOL DISTRICT BOARD OF EDUCATION, et al.,

*Defendants-Appellees*

---

On Appeal from the United States District Court for the
Southern District of Ohio
Dayton Division, No. 3:22-cv-00337

---

## BRIEF OF *AMICI CURIAE* EQUALITY OHIO AND ANNE ROE IN SUPPORT OF APPELLEES

---

David J. Carey
Carlen Zhang-D'Souza
ACLU OF OHIO FOUNDATION
1108 City Park Avenue, Ste. 203
Columbus, OH 43206
Phone: 614-586-1972
Fax: 614-586-1974
dcarey@acluohio.org
czhangdsouza@acluohio.org

Freda Levenson
ACLU OF OHIO FOUNDATION

Michael D. Meuti
David M. Hopkins
BENESCH, FRIEDLANDER,
COPLAN & ARONOFF LLP
127 Public Square, Suite 4900
Cleveland, OH 44114
Telephone: 216-363-4500
Fax: 216-363-4588
mmeuti@beneschlaw.com
dhopkins@beneschlaw.com

Malita Picasso

4506 Chester Ave.
Cleveland, OH 44103
Phone: 614-586-1972
Fax: 614-586-1974
flevenson@acluohio.org

Aditi Fruitwala
Rose Saxe
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY
Phone: 212-549-2500
Fax: 212-549-2650
mpicasso@aclu.org
afruitwala@aclu.org
rsaxe@aclu.org

*Counsel for amici curiae Equality Ohio and Anne Roe*

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 23-3740

Case Name: John and Jane Doe No. 1, et al., v. Bethel Local School District Board of Education, et al.

Name of counsel: David J. Carey

Pursuant to 6th Cir. R. 26.1, Equality Ohio
*Name of Party*

makes the following disclosure:

1. Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

No.

2. Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

No.

CERTIFICATE OF SERVICE

I certify that on ____May 17, 2024____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ David J. Carey
1108 City Park Ave., Ste. 203
Columbus, OH 43206

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents. See 6th Cir. R. 26.1 on page 2 of this form.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 23-3740

Case Name: John and Jane Doe No. 1, et al., v. Bethel Local School District Board of Education, et al.

Name of counsel: David J. Carey

Pursuant to 6th Cir. R. 26.1, Anne Roe
*Name of Party*

makes the following disclosure:

1. Is said party a subsidiary or affiliate of a publicly owned corporation? If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

No.

2. Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest:

No.

CERTIFICATE OF SERVICE

I certify that on May 17, 2024 the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ David J. Carey
1108 City Park Ave., Ste. 203
Columbus, OH 43206

This statement is filed twice: when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents. See 6th Cir. R. 26.1 on page 2 of this form.

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ................................................................. **VI**

**INTRODUCTION AND STATEMENT OF INTEREST** ....................................1

**ARGUMENT** ..................................................................................**3**

   A.  The Prospect of Harm to Transgender Students Easily Satisfies the Applicable Standards of Review ........................................................ 3

      1.   *Appellants' claims invoke no more than rational basis review.* ................. 3

      2.   *The School District's interest in protecting Anne Roe and other transgender students from discrimination and harm easily satisfies rational basis review.* ........................................................ 5

      3.   *This Court Need Not and Should Not Gratuitously Adjudicate Title IX in Its Free Exercise Analysis.* ................................... 7

   B.  Denying Transgender Students Access to School Restrooms That Align With Their Gender Identity Can Cause Serious, Long-Lasting Harm ................... 9

   C.  Anne Roe Experienced These Harms When Excluded from the Girls' Restrooms ............................................................................. 16

**CONCLUSION** ............................................................................**18**

# TABLE OF AUTHORITIES

## Cases

*Adams by and through Kasper v. Sch. Bd. of St. Johns Cnty.*,
   57 F.4th 791 (11th Cir. 2022)...................................................................8

*Armour v. City of Indianapolis*,
   566 U.S. 673 (2012) .........................................................................5

*Bd. of Educ. of the Highland Sch. Dist. v. U.S. Dep't of Educ.*,
   208 F. Supp. 3d 850 (S.D. Ohio 2016)....................................................6

*Brown v. Bd. of Educ.*,
   347 U.S. 483 (1954) .........................................................................9

*Casale v. Nationwide Child's Hosp.*,
   682 F. App'x 359 (6th Cir. 2017).............................................................4

*Church of Lukumi Babulu Aye, Inc. v. City of Hialeah*,
   508 U.S. 520 (1993) .........................................................................5

*Dahl v. Bd. of Trs. Of W. Mich. Univ.*,
   15 F.4th 728 (6th Cir. 2021).................................................................6

*Dodds v. U.S. Dep't of Educ.*,
   845 F.3d 217 (6th Cir. 2016).................................................................6

*Doe v. Boyertown Area Sch. Dist.*,
   897 F.3d 518 (3d Cir. 2018).................................................................12

*Doe v. Mich. Dep't of State Police*,
   490 F.3d 491 (6th Cir. 2007).................................................................5

*Doe v. Porter*,
   370 F.3d 558 (6th Cir. 2004).................................................................1

*Doe v. Snyder*,
   101 F. Supp. 3d 672 (E.D. Mich. 2015)....................................................6

*FCC v. Beach Commc'ns, Inc.*,
   508 U.S. 307 (2020) .........................................................................5

*Fednav, Ltd. v. Chester*,
   547 F.3d 607 (6th Cir. 2008).................................................................5

*G.G. v. Gloucester Cnty. Sch. Bd.*,
   822 F.3d 709 (4th Cir. 2016).................................................................12

*Grimm v. Gloucester Cnty. Sch. Bd.*,
   972 F.3d 586 (4th Cir. 2020)................................................................12

*Heller v. Doe*,
   509 U.S. 312 (1993) ...........................................................................5

*Hicks v. Comm'r of Soc. Sec.*,
   909 F.3d 786 (6th Cir. 2018)................................................................4

*League of Indep. Fitness Facilities*,
   814 F. App'x 125 (6th Cir. 2020)..........................................................5

*N.Y. State Club Ass'n v. City of N.Y.*,
   487 U.S. 1 (1988) ...............................................................................7

*PDK Labs. Inc. v. U.S. D.E.A.*,
   362 F.3d 786 (D.C. Cir. 2004) ............................................................9

*Roberts v. U.S. Jaycees*,
   468 U.S. 609 (1984) ...........................................................................6

*Thompson v. Ashe*,
   250 F.3d 399 (6th Cir. 2001)................................................................5

*Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
   858 F.3d 1034 (7th Cir. 2017)............................................................12

## Other Authorities

Am. Acad. of Pediatrics,
   *Gender Identity Development in Children* (2015),
   https://healthychildren.org/English/ages-stages/gradeschool/Pages/Gender-
   Identity-and-Gender-Confusion-In-Children.aspx ...............................10

Am. Psych. Ass'n & Nat'l Ass'n of Sch. Psychs.,
   *Resolution on gender and sexual orientation diversity in children and
   adolescents in schools* (2015)................................................ 13, 15, 16

Am. Psych. Ass'n,
   *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5-TR) (2022) ...10

Am. Psych. Ass'n,
   *Gender Dysphoria Diagnosis*,
   https://www.psychiatry.org/psychiatrists/diversity/education/transgender and
   gender- nonconforming-patients/gender-dysphoria-diagnosis...........................10

Am. Psychol. Ass'n,

*Guidelines for Psychological Practice with Transgender and Gender Nonconforming People*, 70 Am. Psychologist 832 (2015) ....................................10

Anas I. Ghousheh et al.,
*Advanced Transitional Cell Carcinoma of the Bladder in a 16-Year-Old Girl with Hinman Syndrome*, 80 Urology 1141 (2012) ...............................................15

Andrew R. Flores et al.,
*Gender Identity Disparities in Criminal Victimization: National Crime Victimization Survey, 2017–2018*, Am. J. Pub. Health (April 2021)...................13

Blaise Vanderhorst,
*Whither Lies the Self: Intersex and Transgender Individuals and a Proposal for Brain-Based Legal Sex*, 9 Harv. L. & Pol'y Rev. 241 (2015)..............................10

Coleman et al., World Pro. Ass'n for Transgender Health,
*Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People*, 8th version (2022) ........................................................11

Colt Meier & Julie Harris, Am. Psychol. Ass'n,
*Fact Sheet: Gender Diversity and Transgender Identity in Children*, http://www.apadivisions.org/division-44/resources/advocacy/transgender-children.pdf.................................................................................................................10

David A. Levine & Comm. On Adolescence, Am. Acad. of Pediatrics Techn. Rep.,
*Office-Based Care for Lesbian, Gay, Bisexual, Transgender, and Questioning Youth*, 132 Pediatrics 297 (2013) ......................................................................10

Emily A. Greytak et al., GLSEN,
*Harsh Realities: The Experiences of Transgender Youth in Our Nation's Schools* (2009)..................................................................................................................15

Emily B. Zimmerman et al., U.S. Dep't of Health and Hum. Servs. Agency for Healthcare Rsch. & Quality,
*Understanding the Relationship Between Education and Health: A Review of the Evidence and an Examination of Community Perspectives* (2015), https://www.ahrq.gov/professionals/education/curriculum-tools/population-health/zimmerman.html.........................................................................................16

Enoch Leung, et al.,
*Social support in schools and related outcomes for LGBTQ youth: a scoping review*, 1 Discover Educ. 1 (2022) ....................................................................12

*How long is it safe to hold your urine?* Piedmont Hosp., https://www.piedmont.org/living-real-change/how-long-is-it-safe-to-hold-your-urine ...................................................................................................................14

Jamie M. Grant et al., Nat'l Ctr. for Transgender Equal.,
  *Injustice at Every Turn: A Report of the National Transgender Discrimination
  Survey* (2011),
  http://www.thetaskforce.org/static_html/downloads/reports/reports/ntds_full.pdf
  .....................................................................................................................13

Jody L. Herman,
  *Gendered Restrooms and Minority Stress: The Public Regulation of Gender and
  its Impact on Transgender People's Lives*, 19 Journal of Pub. Mgmt. and Soc.
  Pol'y 65 (2013).......................................................................................15

Joseph G. Kosciw, et al., GLSEN,
  *The 2021 National School Climate Survey: The experiences of LGBTQ+ youth in
  our nation's schools* 12 (2022), https://www.glsen.org/sites/default/files/2022-
  10/NSCS-2021-Full-Report.pdf ..........................................................14

Joseph G. Kosciw, et al.,
  *The 2021 National School Climate Survey: The experiences of LGBTQ+ youth in
  our nation's schools* (2022)...................................................................14

Kasey B. Jackman, et al.,
  *Suicidality among Gender Minority Youth: Analysis of 2017 Youth Risk Behavior
  Survey Data*, 25(2) Archives of Suicide Rsch. 208 (2021)..................................13

Kristina R. Olson, et al*.,
  Mental Health of Transgender Children Who Are Supported in Their Identities*,
  137(3) Pediatrics 1 (Mar. 2016) ...........................................................11

Lawrence E. Armstrong,
  *Challenges of Linking Chronic Dehydration and Fluid Consumption to Health
  Outcomes*, 70 Nutrition Rev. S121 (2012)...........................................................15

Lyndal Bond et al.,
  *Social and School Connectedness in Early Secondary School as Predictors of
  Late Teenage Substance Use, Mental Health, and Academic Outcomes*, 40 J.
  Adolescent Health 357.e9, 357.e16 (2007) ...........................................................11

Milton Diamond,
  *Transsexuality among Twins: Identity Concordance, Transition, Rearing, and
  Orientation*, 14 Int'l J. of Transgenderism 24 (2013)...........................................10

RB Toomey, et al. *Gender-nonconforming lesbian, gay, bisexual, and transgender
  youth: school victimization and young adult psychosocial adjustment*. Dev
  Psychol. 2010 Nov;46(6):1580-9. doi: 10.1037/a0020705. PMID: 20822214....16

S. Jagtap, et al., *Comprehensive assessment of holding urine as a behavioral risk factor for UTI in women and reasons for delayed voiding*. BMC Infect Dis. 2022 Jun 6;22(1):521. doi: 10.1186/s12879-022-07501-4. PMID: 35668379; PMCID: PMC9172065 ........................................................................................................14

## <u>INTRODUCTION AND STATEMENT OF INTEREST</u>

Equality Ohio is a statewide education and advocacy organization dedicated to advancing LGBTQ+ equality in Ohio. Its mission is to transform systems and institutions so LGBTQ+ Ohioans can achieve full lived and legal equality. This action directly implicates Equality Ohio's purpose, as it affects the ability of transgender youth in Ohio to live fully in accordance with their gender identity.

Anne Roe[1] was previously a party to this action, having intervened as a defendant before the district court. Anne is a 16-year-old transgender girl, currently in the tenth grade. Initially, as a student at Bethel Middle School and later Bethel High, Anne used only the school's single-occupancy restrooms. *See generally* Anne Roe Decl., R. 13-1. Unfortunately, she found that doing so "singled [her] out" and "called attention to the fact that [she is] transgender." *Id.* at ¶ 31. Other students taunted and harassed her, hurled insults or slurs at her, pushed or shoulder-checked her in the hallways, asked inappropriate and intrusive questions, or otherwise bullied her nearly every day. Her school performance suffered, and she began holding in her urine in order to avoid using the restroom. *Id.* at ¶¶ 32–36.

---

[1] All parties have consented to the filing of this brief. *Amici* certify that no person or entity other than *amici*, their members, or their counsel, made a monetary contribution to the preparation or submission of this brief, or authored this brief in whole or in part. Anne Roe appears in this action under a pseudonym, on account of her age and the sensitive subject matter. *See generally Doe v. Porter*, 370 F.3d 558, 560 (6th Cir. 2004); Order, R. 30, at PAGEID# 713 (granting leave).

Anne's experience was not a unique one. Extensive social science and medical research confirms that, for transgender students, access to communal restrooms matching their gender identity is no mere personal preference or creature comfort. On the contrary, school support for social transition—part of a person's process of living consistently with their gender identity, which includes visible measures such as using the appropriate restroom—is critical to the health and wellbeing of transgender youth. This is particularly true given that transgender youth are already broadly vulnerable to discrimination, prejudice, and stigma. A supportive environment free of discrimination allows transgender children to thrive; failure to provide that environment may lead to poor educational outcomes, anxiety, depression, substance use, and at worst, even self-injury or suicide.

Fortunately, Anne had such an environment. In 2021, she requested and received permission from the Bethel Local School District (the "School District") to use the girls' communal restrooms, consistent with her gender identity—and almost immediately saw her grades improve, her health concerns vanish, and her profound sense of alienation ease. But approximately one year later, Appellants sued the school district, seeking a court order expelling and barring Anne from the girls' restroom. Anne intervened as a defendant in order to defend her interests.

Anne has since shifted to online classes, and no longer attends Bethel High in person. Accordingly, she has withdrawn as a party. Nonetheless, Anne respectfully

submits that her particular perspective—both as a transgender student who benefited from the challenged accommodation, and as a former party in this action—will be of use to this Court. The School District's interest in protecting Anne and other students like her is not merely a legitimate one sufficient to satisfy rational basis review; it is compelling.

## **ARGUMENT**

### A. The Prospect of Harm to Transgender Students Easily Satisfies the Applicable Standards of Review

#### 1. *Appellants' claims invoke no more than rational basis review.*

As the district court correctly found, none of Appellants' claims invoke any degree of scrutiny beyond rational basis—and for most, not even that. Their Title IX claim fails for lack of standing, as they did not allege discrimination on the basis of their sex. Rather, they alleged only disagreement about the School District's interpretation of Title IX itself, and sought an impermissible advisory opinion to resolve the disagreement.[2] *See* Dismissal Order, R. 94 at PAGEID# 2012–24. Their

---

[2] Appellants have repeatedly attempted to change the nature of their Title IX claim in search of a valid theory. In their complaint, they sought a "declaratory judgment that Title IX does not require Bethel to implement an intimate facility policy based on gender identity … and that it is permissible for the Board to have biologically sex-segregated intimate facilities." R. 1 at PAGEID# 19. At oral argument on their preliminary injunction motion, they explained that they sought "clarity" on the meaning of Title IX so that the School District "could make decisions off of it." R. 56 at PAGEID# 1230–31. Later, when instructed to brief the question of standing, they explained that they "are being injured by Defendants' enforcement of Title

fundamental parenting right claim fails because parents have no power either to control public school operations, nor to demand that the School District respond to what are essentially litigation interrogatories. *See* Dismissal Order at PAGEID# 2024–26. Their equal protection claim fails both for lack of standing and glaring flaws on the merits, *id.* at PAGEID# 2026–31, and Appellants have abandoned it on appeal in any event. Only their free exercise claim warrants even rational basis review. It does not warrant a higher degree of scrutiny, as the School District's accommodation does not impose a substantial burden on the free exercise of religion, and is both neutral and generally applicable. *Id.* at PAGEID# 2032–33.

---

IX." R. 67 at PAGEID# 1460. They also speculated that if events had unfolded differently, Anne Roe might have brought her own Title IX claim against the school, a prospect that Appellants claimed warranted preemptive adjudication of that hypothetical claim. *Id.* at PAGEID# 1461–62.

Now, on appeal, Appellants argue that the School District's restroom policy itself violates Title IX. This novel theory was never pled, and only vaguely hinted at below in a single passing mention in a response brief. *See* R. 94 at PAGEID# 2018 n.5. The district court rightly declined to guess at the nature of Appellants' claim or argument, or to craft their argument for them. *Id.*

Appellants have forfeited this novel Title IX theory. "Issues cursorily mentioned without any sort of developed argument are routinely deemed forfeited." *Hicks v. Comm'r of Soc. Sec.*, 909 F.3d 786, 826 (6th Cir. 2018) (declining to review a legal theory that received only "passing" or "perfunctory" mention below). This Court's "function is to review the case presented to the district court, not a better case fashioned after a district court's unfavorable order." *Casale v. Nationwide Child's Hosp.*, 682 F. App'x 359, 367 (6th Cir. 2017) (internal citation and quotation marks omitted).

Rational basis review is "highly deferential." *Doe v. Mich. Dep't of State Police*, 490 F.3d 491, 501 (6th Cir. 2007). The challenged accommodation need only be "rationally related to a legitimate government purpose." *Thompson v. Ashe*, 250 F.3d 399, 407 (6th Cir. 2001); *see also, e.g.*, *Church of Lukumi Babulu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 543 (1993). The burden lies with Appellants to negate "every conceivable basis which might support" the government's actions. *Armour v. City of Indianapolis*, 566 U.S. 673, 681 (2012) (quoting *Heller v. Doe*, 509 U.S. 312, 320 (1993)) (internal quotation marks omitted). It is "constitutionally irrelevant" whether the cited interest was actually the government's reason for the challenged enactment or action. *Fednav, Ltd. v. Chester*, 547 F.3d 607, 624–25 (6th Cir. 2008). Even "rational speculation unsupported by evidence or empirical data" suffices to defeat a claim. *League of Indep. Fitness Facilities*, 814 F. App'x 125, 128 (6th Cir. 2020) (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (2020)) (internal quotation marks omitted).

2. *The School District's interest in protecting Anne Roe and other transgender students from discrimination and harm easily satisfies rational basis review.*

The School District's accommodation was rationally related to at least two legitimate interests. First, the School District accommodated Anne Roe in order to avoid discriminating against her on the basis of sex and transgender status, consistent with this Court's decision in *Dodds v. U.S. Dep't of Educ.*, 845 F.3d 217, 222 (6th

5

Cir. 2016). *See* Dismissal Order at PAGEID# 2038 (citing *Dodds* and *Bd. of Educ. of the Highland Sch. Dist. v. U.S. Dep't of Educ.*, 208 F. Supp. 3d 850, 854 (S.D. Ohio 2016)). Second, as explained in greater depth below, the health and safety of transgender students is at risk when they are denied restroom accommodations consistent with their gender identity. *See infra* at 12-15. The School District had a powerful interest in preventing those consequences. In Anne Roe's case specifically, the School District was well aware that under the previous status quo—that is, being relegated to a single-occupancy restroom—Anne had suffered severe bullying and humiliation. *See* Dismissal Order at PAGEID# 1999–2000. This caused her to avoid using the restroom at school, and negatively affecting her health and school performance. *Id.*

That alone resolves Appellants' claims, as it provides far more than a rational basis for the accommodation to Anne Roe. Indeed, even if Appellants could successfully invoke a higher degree of scrutiny—which they cannot—the School District's accommodation would survive it. Each of these interests is not only legitimate, but compelling. *See, e.g.*, *Dahl v. Bd. of Trs. Of W. Mich. Univ.*, 15 F.4th 728, 735 (6th Cir. 2021) (noting compelling interest in protecting students from COVID-19); *Doe v. Snyder*, 101 F. Supp. 3d 672, 700 (E.D. Mich. 2015) (recognizing a compelling interest in protecting the safety of minors); *cf. also, e.g.*, *Roberts v. U.S. Jaycees*, 468 U.S. 609, 628 (1984) (discrimination in the

"distribution of publicly available goods, services, and other advantages cause[s] unique evils that government has a compelling interest to prevent"); *N.Y. State Club Ass'n v. City of N.Y.*, 487 U.S. 1, 14 n.5 (1988) (recognizing the "State's 'compelling interest' in combating invidious discrimination").

The School District's accommodation was as narrowly tailored as possible to accommodate all of its students while serving the interests of nondiscrimination and safety. Under the accommodation, all students were treated alike. The only alternatives—forcing Anne Roe to use the wrong restroom, or continuing to stigmatize her by requiring her to use a single-occupancy restroom—would impose the exact harms the School District sought to prevent. *See* Dismissal Order at PAGEID #1999–2000 (noting that Anne had been humiliated, ostracized, and targeted by other students who taunted her for using the separate restroom, leading to her needing to hold her urine and causing harm to her health). And indeed, Appellants have conceded that the school acted for the purpose of preventing discrimination, and the harm to transgender students that it would cause. *See* Compl., R. 1 at ¶¶ 3, 49, 52.

> 3. *This Court Need Not and Should Not Gratuitously Adjudicate Title IX in Its Free Exercise Analysis.*

Throughout this case, Appellants have desperately sought an advisory opinion about Title IX. Having failed to state a valid Title IX claim, *see supra* 3 & n. 2, they attempt to introduce the same legal issue—specifically, whether Title IX requires

public schools to allow transgender students to use restrooms matching their gender identity—indirectly. *See generally* Appellants' Br. at 34 (internal page 24). That issue is not properly before the Court in this appeal, and accordingly, this Court's previous ruling on the matter should not be reopened.

Under the auspices of their free exercise claim, Appellants argue that the primary interest underlying the School District's restroom accommodation to Anne Roe was Title IX compliance. Citing one out-of-circuit case, they argue that this Court's decision in *Dodds* was incorrect and that Title IX compliance did not require Anne's accommodation. *Id.* (citing *Adams by and through Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 804 (11th Cir. 2022) (*en banc*)). In Appellants' view, the School District's action therefore fails strict scrutiny. Appellants' Br. at 34–35 (internal page numbers 24–25). That is wrong on multiple levels.

First, as noted above, Appellants can only invoke rational basis review, not strict scrutiny. Second, the School District has multiple governmental interests— both legitimate and compelling—underlying the accommodation offered to Anne. Third, Appellants' free exercise claim does not justify revisiting *Dodds*. To the extent the School District believed that *Dodds* required the accommodation, in the rational basis framework, the relevant question is not whether *Dodds* was actually correct. The question is whether the School District's decision to follow this Court's guidance in *Dodds* was rationally related to its interest in Title IX compliance. The

answer to that question is yes. This Court need not revisit its own ruling on the underlying Title IX issue in order to determine whether the School District acted rationally in following it.

Under "the cardinal principle of judicial restraint[,]" "if it is not necessary to decide more, it is necessary not to decide more." *PDK Labs. Inc. v. U.S. D.E.A.*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in judgment). Appellants would have this Court ignore this principle, in service of gratuitously reconsidering Title IX precedent and issuing the same *de facto* advisory opinion they have sought at every stage of this litigation. This Court should not take the bait.

B.  Denying Transgender Students Access to School Restrooms That Align
    With Their Gender Identity Can Cause Serious, Long-Lasting Harm

Courts have long recognized that separating students based on their inherent characteristics carries serious and lasting consequences; it "generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone." *Brown v. Bd. of Educ.*, 347 U.S. 483, 494 (1954). "The impact is greater when it has the sanction of the law. . . . ." *Id.* (citation and quotation marks omitted).

Specifically, singling out and segregating transgender students from their non-transgender peers can harm transgender students' health, well-being, and educational opportunities, and runs counter to medical guidance. Established

medical consensus confirms that the only effective treatment for gender dysphoria,

which occurs when a person experiences a mismatch between their experienced

gender and assigned gender,[3] is to enable a transgender person to live fully in

accordance with their gender identity.[4] One important component of living in

---

[3] Gender dysphoria is the scientific term for a "marked incongruence" between one's gender identity and assigned sex and is accompanied by clinically significant distress unless treated. Am. Psych. Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5-TR) (2022). Being transgender itself is not, as the American Psychiatric Association explains, a "mental disorder." Am. Psych. Ass'n, *Gender Dysphoria Diagnosis*, https://www.psychiatry.org/psychiatrists/diversity/education/transgender and gender- nonconforming-patients/gender-dysphoria-diagnosis.

[4] Gender identity is a person's inner sense of belonging to a particular gender. It is an innate, core component of human identity, and has a biological basis. *See* Blaise Vanderhorst, *Whither Lies the Self: Intersex and Transgender Individuals and a Proposal for Brain-Based Legal Sex*, 9 Harv. L. & Pol'y Rev. 241, 259-60 (2015) (reviewing scientific research); Milton Diamond, *Transsexuality among Twins: Identity Concordance, Transition, Rearing, and Orientation*, 14 Int'l J. of Transgenderism 24 (2013). Every person has a gender identity, which cannot be altered voluntarily. *See, e.g.*, Colt Meier & Julie Harris, Am. Psychol. Ass'n, *Fact Sheet: Gender Diversity and Transgender Identity in Children*, http://www.apadivisions.org/division-44/resources/advocacy/transgender-children.pdf; *see also* Am. Acad. of Pediatrics, *Gender Identity Development in Children* (2015), https://healthychildren.org/English/ages-stages/gradeschool/Pages/Gender-Identity-and-Gender-Confusion-In-Children.aspx.

Transgender individuals have a gender identity that is not aligned with the sex assigned to them at birth. Am. Psychol. Ass'n, *Guidelines for Psychological Practice with Transgender and Gender Nonconforming People*, 70 Am. Psychologist 832, 834 (2015); *see also* David A. Levine & Comm. On Adolescence, Am. Acad. of Pediatrics Techn. Rep., *Office-Based Care for Lesbian, Gay, Bisexual, Transgender, and Questioning Youth*, 132 Pediatrics 297, 298 (2013).

accordance with one's gender identity is social transition, which may include elements such as adopting a new haircut or way of dressing, a new name and different pronouns, and using restrooms consistent with one's gender identity.

School-supported social transition significantly eases the symptoms of gender dysphoria, prevents severe harm, and allows transgender children to thrive.[5] Indeed, gender-affirming school policies have been found to dramatically improve transgender students' quality of life, not just during childhood and adolescence, but well into adulthood. Transgender youth who have been in affirming school environments that support their gender identities have developmentally normal levels of depression[6], only minimal elevations in anxiety[7], and are less likely to suffer substance abuse later in life[8]. What is more, transgender youth who find mentors in teachers, staff members, and school administrators are "three times as

---

[5] Coleman et al., World Pro. Ass'n for Transgender Health. *Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People*, 8th version (2022).

[6] *See* Kristina R. Olson, et al*., Mental Health of Transgender Children Who Are Supported in Their Identities*, 137(3) Pediatrics 1 (Mar. 2016).

[7] *See id*.

[8] Lyndal Bond et al., *Social and School Connectedness in Early Secondary School as Predictors of Late Teenage Substance Use, Mental Health, and Academic Outcomes*, 40 J. Adolescent Health 357.e9, 357.e16 (2007).

likely to graduate from high school . . . and ha[ve] positive[] . . . engagement and connectedness to their school[s]."[9]

Conversely, when transgender students are segregated from their peers—such as by being excluded from common areas like restrooms—their health, identities, and lives are threatened. *See, e.g.*, *Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 529 (3d Cir. 2018) ("When transgender students face discrimination in schools, the risk to their wellbeing cannot be overstated—indeed, it can be life threatening."); *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1045 (7th Cir. 2017) (school district stigmatized student "when it dismissed him to a separate bathroom" because he was transgender); *G.G. v. Gloucester Cnty. Sch. Bd.*, 822 F.3d 709, 728 (4th Cir. 2016) (Davis, J., concurring) (forcing student to use separate restroom "accentuat[es] his 'otherness,' undermin[es] his identity formation, and imped[es] his medically necessary social transition process. The shame of being singled out and stigmatized . . . every time he needs to use the restroom is a devastating blow . . . and places him at extreme risk for immediate and long-term psychological harm"), *vacated on other grounds*, 137 S. Ct. 1239 (2017); *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 617-18 (4th Cir. 2020) ("The stigma of being forced to use a separate restroom . . . 'invites more scrutiny and attention' from

---

[9] Enoch Leung, et al., *Social support in schools and related outcomes for LGBTQ youth: a scoping review*, 1 Discover Educ. 1, 11 (2022) (citations omitted).

other students, 'very publicly branding all transgender students with a scarlet T'") (citations omitted), *rehearing en banc denied*, 976 F.3d 399 (2020).

It is well documented that transgender individuals experience widespread prejudice and discrimination, which frequently takes the form of violence, harassment, or other abuse.[10] Discriminatory restroom policies perpetuate such stigma and discrimination, by marking transgender students as "others" who are unsuitable to use the restrooms that their non-transgender peers use. Such policies communicate that transgender individuals are inferior and deserve to be treated differently. In doing so, these policies exacerbate the risk of "anxiety and depression, low self-esteem, engaging in self-injurious behaviors, suicide, substance use, homelessness, and eating disorders among other adverse outcomes" that many transgender individuals face.[11] Indeed, transgender youth are more than twice as likely as their peers to miss school because they feel uncomfortable or unsafe.[12]

---

[10] Andrew R. Flores et al., *Gender Identity Disparities in Criminal Victimization: National Crime Victimization Survey, 2017–2018*, Am. J. Pub. Health (April 2021); Jamie M. Grant et al., Nat'l Ctr. for Transgender Equal., *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey* 2-8 (2011), http://www.thetaskforce.org/static_html/downloads/reports/reports/ntds_full.pdf.

[11] Am. Psych. Ass'n & Nat'l Ass'n of Sch. Psychs., *Resolution on gender and sexual orientation diversity in children and adolescents in schools* (2015) at 4, https://www.apa.org/about/policy/orientation-diversity

[12] Kasey B. Jackman, et al., *Suicidality among Gender Minority Youth: Analysis of 2017 Youth Risk Behavior Survey Data*, 25(2) Archives of Suicide Rsch. 208, 211 (2021); Joseph G. Kosciw, et al., GLSEN, *The 2021 National School Climate*

Discriminatory policies can have acute health effects as well. Policies that preclude transgender individuals from using restrooms consistent with their gender identity force transgender students to choose between using a restroom inconsistent with their gender identity (and risk discrimination and harassment), using a single user restroom (and face outing and stigma), or avoiding using the restroom all together. A recent national survey reported that 45 percent of transgender students have avoided going to the restroom at school.[13] Such behavior can lead to medical problems—such as a urinary tract infection[14], renal failure[15], urinary incontinence[16],

---

*Survey: The experiences of LGBTQ+ youth in our nation's schools* 12 (2022), https://www.glsen.org/sites/default/files/2022-10/NSCS-2021-Full-Report.pdf (nearly a third of LGBTQ+ students reported missing at least one day of school in the past month because they felt uncomfortable or unsafe).

[13] Joseph G. Kosciw, et al, *The 2021 National School Climate Survey: The experiences of LGBTQ+ youth in our nation's schools* 11 (2022).

[14] S. Jagtap, et al., *Comprehensive assessment of holding urine as a behavioral risk factor for UTI in women and reasons for delayed voiding*. BMC Infect Dis. 2022 Jun 6;22(1):521. doi: 10.1186/s12879-022-07501-4. PMID: 35668379; PMCID: PMC9172065.

[15] *How long is it safe to hold your urine?* Piedmont Hosp., https://www.piedmont.org/living-real-change/how-long-is-it-safe-to-hold-your-urine.

[16] *Id.*

or cancer[17]—and make it difficult to focus on school[18].  Some transgender students experiencing fear and anxiety about restroom usage may dehydrate themselves, which can lead to urinary tract infections, kidney stones, and other serious conditions.[19]

In addition to these immediate health impacts, unsupportive policies in school can produce poor educational outcomes for transgender individuals[20] with impacts long after transgender students leave the school environment. Poorer educational outcomes may lead to lower lifetime earnings and an increased likelihood of worse health outcomes later in life.[21] Such stigma and discrimination is also associated with

---

[17] Anas I. Ghousheh et al., *Advanced Transitional Cell Carcinoma of the Bladder in a 16-Year-Old Girl with Hinman Syndrome*, 80 Urology 1141 (2012).

[18] Jody L. Herman, *Gendered Restrooms and Minority Stress: The Public Regulation of Gender and its Impact on Transgender People's Lives*, 19 Journal of Pub. Mgmt. and Soc. Pol'y 65, 74-75 (2013) (survey respondents reported that "accessing and using restrooms was disruptive to their daily life at school," and 54% of survey respondents "reported having some sort of physical problem from trying to avoid using public restrooms").

[19] Lawrence E. Armstrong, *Challenges of Linking Chronic Dehydration and Fluid Consumption to Health Outcomes*, 70 Nutrition Rev. S121, 122 (2012).

[20] *See* Am. Psych. Ass'n & Nat'l Ass'n of Sch. Psychs., *Resolution on gender and sexual orientation diversity in children and adolescents in schools* (2015) at 6, https://www.apa.org/about/policy/orientation-diversity; Emily A. Greytak et al., GLSEN, *Harsh Realities: The Experiences of Transgender Youth in Our Nation's Schools* (2009).

[21] *See, e.g.*, Emily B. Zimmerman et al., U.S. Dep't of Health and Hum. Servs. Agency for Healthcare Rsch. & Quality, *Understanding the Relationship Between*

an increased risk of post-traumatic stress disorder, depression, anxiety, and suicidality in subsequent years.[22]

### C. Anne Roe Experienced These Harms When Excluded from the Girls' Restrooms

Simply put, Anne Roe is a case in point. Her testimony in the district court in this matter serves to underscore precisely the types of harms that compelled the School District to ensure that she could use a communal restroom corresponding to her gender identity.

Anne Roe is a 16 year-old transgender girl. She previously attended Bethel High School. She is the student whose restroom use prompted this litigation. While she is presently taking online classes and thus has withdrawn her intervention in this matter, Anne's own circumstances demonstrate the importance of restroom policies and accommodations like the School District's here, and the harms that exclusion can cause.

---

*Education and Health: A Review of the Evidence and an Examination of Community Perspectives* (2015), https://www.ahrq.gov/professionals/education/curriculum-tools/population-health/zimmerman.html.

[22] RB Toomey, et al. *Gender-nonconforming lesbian, gay, bisexual, and transgender youth: school victimization and young adult psychosocial adjustment*. Dev Psychol. 2010 Nov;46(6):1580-9. doi: 10.1037/a0020705. PMID: 20822214, at 1581; *see also* Am. Psych. Ass'n & Nat'l Ass'n of Sch. Psychs., *Resolution on gender and sexual orientation diversity in children and adolescents in schools* (2015) at 6.

In January 2020, Anne enrolled at Bethel Middle School. Anne Roe Decl., R. 13-1, at ¶ 20. From this time until January 2022, Anne used the single-occupancy restroom in the Nurse's Office or the Faculty Restroom located between the middle school office and the high school office. *Id.* at ¶¶ 23–24. However, Anne confided to her family that she felt alienated for having to use a separate restroom and was being harassed and taunted by other students. *Id.* at ¶ 32 ("students would shout transphobic remarks or slurs … or ask inappropriate and invasive questions about my body. Students would routinely push or shoulder-check me in hallways. Once, I heard a student in the hallway proclaim, 'we should kill all transgenders.' Another time, someone left a pair of scissors on my seat in class, with the points facing upwards."); ¶ 33 ("I believe that having to use only a single-occupancy restroom made the bullying and harassment worse. It singled me out and called attention to the fact that I am transgender[.]"); *see also* Joanne Roe Decl., ¶ 26. She also started experiencing urinary tract infections because the restrooms she used were inconveniently located or were occupied by others when she needed to use them. Anne Roe Decl. at ¶¶ 34–36; Joanne Roe Decl. at ¶ 26.

Eventually, for Anne's safety and health, she and her family sought permission for Anne to use the girls' communal restrooms, in addition to the single-use restrooms. Anne Roe Decl. at ¶ 37. The school agreed that Anne would be

allowed to use the girls' communal restroom once she returned from Winter Break in January of 2022. *Id.* at ¶¶ 39–40.

This accommodation changed everything. In addition to having far fewer urinary tract infections, Anne became visibly more invested in school and her extracurricular activities. She went from being anxious and depressed to extremely outgoing. Before this change, Anne would rush home after school in order to relieve herself after having held in her urine all or most of the day. After this change, she was able to focus on her academic performance, extracurricular activities, and even on building friendships with her classmates. Her grades also improved, which her family believes is a direct result of her ability to concentrate more fully without the distraction of needing to use the restroom and being unable to do so. *See id.* at ¶¶ 42–43; Joanne Roe Decl. ¶¶ 35–38.

Anne Roe's experience underscores one of the most salient points in this case: public schools have a powerful interest in preventing the kind of discrimination, bullying, and ostracism that Anne suffered prior to the School District's restroom accommodation. That interest is beyond rational; it is compelling.

## **CONCLUSION**

For the foregoing reasons, *amici curiae* Equality Ohio and Anne Roe respectfully submit that this Court should affirm the District Court's judgment dismissing Appellants' claims.

Dated: May 17, 2024

Respectfully submitted,

/s/ David J. Carey

David J. Carey
Carlen Zhang-D'Souza
ACLU OF OHIO FOUNDATION
1108 City Park Avenue, Ste. 203
Columbus, OH 43206
Phone: 614-586-1972
Fax: 614-586-1974
dcarey@acluohio.org
czhangdsouza@acluohio.org

Freda Levenson
ACLU OF OHIO FOUNDATION
4506 Chester Ave.
Cleveland, OH 44103
Phone: 614-586-1972
Fax: 614-586-1974
flevenson@acluohio.org

Michael D. Meuti
David M. Hopkins
BENESCH, FRIEDLANDER,
COPLAN & ARONOFF LLP
127 Public Square, Suite 4900
Cleveland, OH 44114
Telephone: 216-363-4500
Fax: 216-363-4588
mmeuti@beneschlaw.com
dhopkins@beneschlaw.com

Malita Picasso
Aditi Fruitwala
Rose Saxe
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY
Phone: 212-549-2500
Fax: 212-549-2650
mpicasso@aclu.org
afruitwala@aclu.org
rsaxe@aclu.org

*Counsel for amici curiae Equality Ohio and Anne Roe*

19

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I certify that this document complies with the word limit of Fed R. App. P. 29(a)(5) because it contains 4,521 words, excluding elements exempted by Fed. R. App. P.32(f) and 6th Cir. R. 32(b)(1). Additionally, I certify that this document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it was prepared in 14-point Times New Roman font using Microsoft Word.

Dated: May 17, 2024                   By:    /s/ David J. Carey          
                                             David J. Carey

                                             *Counsel for Amici Curiae*

**CERTIFCATE OF SERVICE**

I hereby certify that on this 17th day of May, 2024, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Sixth Circuit via the ECF system, which will send notification of such filing to all counsel of record.

Dated: May 17, 2024              By:    /s/ David J. Carey
                                        David J. Carey

                                        *Counsel for Amici Curiae*